CHARLES F. ORTHWEIN

*v.*

CHARLES W. THOMAS *et al.*

*Filed at Mt. Vernon April 5, 1889.*

1. DESCENTS—*illegitimates—meaning of the words "child" and "children."* Prior to 1822 the common law in regard to illegitimates had not been modified by statute, and a bastard could not inherit, even from its mother. The words "children" and "child," when used in a statute, are construed to embrace only legitimate children.

2. SAME—*presumption in favor of legitimacy.* The law will presume that every child is the offspring of a lawful rather than a meretricious union of the parents, and that consequently the mother, either by actual marriage or by cohabitation and recognition, was the lawful wife of the father.

3. Inasmuch as the presumption of the legitimacy of offspring attaches to every child, the burden of showing illegitimacy is cast on those who allege it. Mere rumor is insufficient to bastardize issue, or require positive proof of actual marriage. If the presumption is false, that may be shown by repellant facts, otherwise the presumption, from mere filiation, must stand.

4. ESTOPPEL—*of grantee, as to recitals in deed.* The grantee in a deed is estopped to deny the recitals therein, and after the deed is

recorded in the proper county, all persons claiming through him will be equally estopped. When such deed names a person as the wife of another, in reciting the grounds for a conveyance, the grantee and those claiming under him will not be allowed to deny the lawful marriage of such person, and bastardize her issue.

5. ESTATE BY THE CURTESY. On the death of a married woman, in 1832, seized in fee of land and leaving issue, the husband took an estate by the curtesy in the wife's lands, and the children, the heirs of both, will have no right of entry in the lifetime of the father.

6. TENANCY BY THE ENTIRETY—*deed to husband and wife.* Where the owner of land conveyed the same to "T. O., and S. O., his wife, and their heirs and assigns forever," in 1825, it was *held,* that the conveyance being to a husband and wife, they took the estate granted as tenants by the entirety, and neither one was capable of claiming or holding adversely to the other.*

7. LIMITATIONS—*color of title—whether acquired in good faith.* Where a husband, with both actual and constructive notice of his wife's title to land, fraudulently procured a decree in a suit to which she was a stranger, under which a deed was made to the husband, of such lands, it was *held,* that such deed could not be relied on as color of title, because it was acquired fraudulently, and not in good faith.

8. SAME—*when the statute begins to run—as against a remainder-man.* Until the death of the life tenant, no statute of limitations will begin to run against the remainder-man, and *laches* will be imputed to him only from the time his right of entry accrues.

9. *A party in the actual possession* of land may safely lie by until his possession is invaded or his title attacked. Until this is done, *laches* will not run against him.

10. DECREE—*upon whom binding—parties and privies—who regarded as privies.* It is only parties, and their privies in blood or estate, that are estopped by a decree or judgment; and parties to a decree, in the eye of the law, are those only who are named as such in the record, and are properly served with process or enter their appearance. A privy in blood or estate is one who derives his title to the property in question by descent or purchase, and a privy to a judgment or decree is one whose succession to the rights of property thereby affected occurred after the institution of the particular suit, and from a party thereto.

11. SAME—*as to one not a party.* A decree of court finding the title to a wife's land to be in her husband, who files the bill, will not bind the wife when she is not made a party to the suit.

* See *Cooper* v. *Cooper,* 76 Ill. 57; *Almond* v. *Bonnell,* id. 537; *Harrer* v. *Wallner,* 80 id. 197.

APPEAL from the Circuit Court of St. Clair county; the Hon. GEORGE W. WALL, Judge, presiding.

Mr. R. F. WINGATE, and Mr. J. B. BOWMAN, for the appellant:

In proving title by descent, proof of facts from which legitimacy may be inferred, is sufficient. *Pratt* v. *Pierce*, 36 Me. 448.

Every child is presumed to be legitimate, and in the absence of evidence to the contrary, no proof of marriage of the parents is required. The law is unwilling to bastardize children, and imposes the burden of proof upon the party alleging illegitimacy. *Strode* v. *Gowan*, 2 Bush, 621.

In evidence of marriage, proof of actual marriage, in the case of obscure families, must be very slight. On the question of legitimacy, recognized authority is not to be found requiring the heir, an acknowledged and conceded child, to prove an act of marriage as a requisite to maintain its legitimacy. The presumption and charity of the law are in its favor, and they who wish to bastardize the child, must make out the fact by clear and irrefragible proof. The presumption in favor of marriage can only be negatived by disproving every reasonable possibility. *Caujolle* v. *Ferrie*, 23 N. Y. 91.

General reputation as to illegitimacy is inadmissible as evidence. *Phillips* v. *Allen*, 2 Allen, 453; *Haddock* v. *Railroad Co.* 3 id. 298.

Evidence that a child was treated as illegitimate by its relations, is inadmissible. *Hemmenway* v. *Towner*, 1 Allen, 209.

Suspicions, conjectures and rumors, however strong, will not do to rebut this presumption. *Caujolle* v. *Ferrie*, 23 N. Y. 91.

Suspicions and doubts can not be indulged. *Patterson* v. *Gaines*, 6 How. 551; *Strode* v. *Gowan*, 2 Bush, 621.

The presumption of legitimacy is not lightly to be repelled. It is not to be broken in upon or shaken by a mere balance of probabilities. The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive. *Ferrie* v. *Public Admr.* 4 Bradf. 83.

Even where there are conflicting presumptions on questions of legitimacy, the presumption of innocence must prevail. *Seuser* v. *Bower*, 1 Pa. St. 450; *In re Taylor*, 9 Paige, 611; *Strode* v. *Gowan*, 2 Bush, 621; *Durkins* v. *Samuel*, 10 Rich. 66; *Patterson* v. *Gaines*, 6 How. 551; *Donnelly* v. *Donnelly*, 8 B. Mon. 113; *Caujolle* v. *Ferrie*, 23 N. Y. 91; *Hill* v. *Hill*, 32 Pa. St. 511; *Starr* v. *Peck*, 1 Hill, 270.

As a general rule, recitals in a family deed will be received on a question of pedigree. (1 Greenleaf on Evidence, sec. 103.) Especially as against the parties thereto. *Pinckard* v. *Milmine*, 76 Ill. 453; *Byrne* v. *Morehouse*, 22 id. 603.

It may be that the expressions employed in the deed from James and Fanny Hillman to Osborn, that said Hannah had died "leaving the said James Hillman, her father, and Fanny, his wife, his (her) heirs-at-law," will be resorted to as proof to establish the charge that said Susannah was an illegitimate child of said Hannah Ratcliff. But this rule has its limitations, among which are: The recitals are restricted to statements of facts as to births, marriages, deaths or mutual relationships of the persons whose pedigree is in question; and they must have been made by relatives since deceased, who at the time of making the recitals had no interest in misrepresenting the facts therein stated. *Vowles* v. *Young*, 13 Ves. 140; *Waldron* v. *Tuttle*, 4 N. H. 371.

Susannah was not a party to this deed, and the assertion of a conclusion of law, in a family deed or otherwise, as, that one person is the "heir" of another, is not competent as evidence. In proof of heirship, the relationship of the parties must be shown by the facts, leaving the court to determine the heirship. *Moorehouse* v. *Mathews*, 2 Comst. 514.

As to the admissibility of hearsay in matters of pedigree, see *Monkton* v. *Attorney General*, 2 R. & M. 147; 1 Greenleaf on Evidence, sec. 103; 1 Phillips on Evidence, (4th ed.) 203, 204; *Strode* v. *Gowan*, 2 Bush, 621; *Waldron* v. *Tuttle*, 4 N. H. 371.

The, decree in 1825 is void for fraud in its procurement. Freeman on Judgments, secs. 99, 336, 449, 491, 334, 335; *Griffith* v. *Clark,* 18 Md. 457.

° Mrs. Osborn not being a party to that decree, it is void as to her and her rights. *D'Armond* v. *Adams,* 25 Ind. 554; *Callahan* v. *Griscold,* 9. Mo. 784; *Morris* v. *Hogle,* 37 Ill. 150; *Huls* v. *Buntin,* 47 Ill. 396; *Borders* v. *Murphy,* 78 id. 81; Freeman on Judgments, sec. 162.

Mr. M. MILLARD, and Mr. WILLIAM P. LAUNTZ, for the village . of Brooklyn.

Mr. CHARLES W. THOMAS, and Mr. C. H. PATTON, for the other appellees.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

This was a proceeding in equity to establish title, and for the partition of all that part of United States survey No. 764, in St. Clair county, lying between Water street, in the village of Brooklyn, and the Mississippi river, being 1995 feet long north and south, and about 2000 feet wide, and which has been formed by accretion since 1837, when the village was platted. The complainants in the original bill claim to be the owners of the premises in question in fee, as tenants in common, under *mesne* conveyances from Thomas Osborn. The village of Brooklyn, one of the defendants, claims the premises by virtue of a town plat, made and recorded by Thomas Osborn and his immediate grantees in 1837, and as accretions to Water street; and the appellant, also one of the defendants, claims an undivided thirty-three thirty-fifth interest in the same premises, under *mesne* conveyances from the heirs of Susannah Osborn. Answers were filed to the bill, and defendant Orthwein exhibited his cross-bill, which was also answered. Replications were filed and testimony taken under the original and cross-bills and answers, and upon the hear-

ing both the original and cross-bills were dismissed. The defendant Orthwein alone perfected his appeal, and brings the record into this court, assigning for error the dismissal of his cross-bill.

Hannah Ratcliff, or Hannah Hillman, the same person, is the common source of title. Hannah Hillman was the daughter of James and Fanny Hillman. About 1808 she removed from Pennsylvania and settled in St. Clair county. She bought the militia claim of John Moredock, No. 610, for one hundred acres of land, which was located upon United States survey No. 764, which is the tract of land to which the land in controversy is an accretion, and upon which she settled about 1813, occupying it as a residence while she lived, and owned it in fee at the time of her death, in 1822. She died intestate, leaving surviving one child, Susannah, born in 1786, who, in 1807, intermarried with Thomas Osborn. Susannah and her husband moved upon this land of her mother's about 1816, and also occupied it as a residence from that time till the death of Susannah, in 1832. Susannah died intestate, leaving surviving, her husband, Thomas Osborn, and six children.

It appears that Hannah Hillman emigrated to this State with one William Ratcliff; that they here lived together upon this survey, as man and wife, until Hannah's death. There is no direct evidence of their marriage. The first serious question presented is as to the legitimacy of Susannah. She was the daughter of said Hannah, but the original bill charges that she was a bastard, and incapable of taking, by descent, the lands owned in fee by her mother at the death of the latter. When Hannah died, her father and mother, James and Fanny Hillman, were still living in Pennsylvania, and the theory of the bill is, that James and Fanny Hillman took by descent, as heirs of their daughter, Hannah, survey No. 764, and that Susannah took nothing.

At the time of Hannah's death, in 1822, the common law had not been modified by statute, and a bastard could not in-

herit, even from its mother. It is true, that from the earliest organization of civil government in the territory north-west of the river Ohio, the descent of property had been regulated by written law. The rule of descent was first declared in the ordinance of 1787, and the act of March 23, 1819, (Laws 1819, sec. 21, p. 230,) in force in 1822, was a literal transcript of the second section of the ordinance. And although the rule had, meantime, been thrice declared by legislative authority, viz., by the Governor and judges of the territory north-west of the Ohio river in 1795, (Ter. Laws 1795, sec. 4, p. 92,) by the legislature of the Indiana Territory in 1807, (Rev. Stat. Ind. Ter. 1807, p. 77,) and by the Governor and judges of the Illinois Territory in 1809, (1 Pope's Digest, sec. 22, p. 207,) in every instance the persons first taking from the ancestor were described as "children." Susannah was the child of Hannah, and within the letter of the statute; but if illegitimate, she would nevertheless be excluded from the inheritance, for, under the rule of construction as applied to statutes, the word "child" or "children" embraces only legitimate children. (*Blacklaws* v. *Milne*, 82 Ill. 505.) It was not until 1829 that the rule of the common law was so modified in this State as that illegitimates could inherit from their mother. (Rev. Laws 1829, sec. 47, p. 207.) And this has been the rule of descent from that time to the present.

If, then, the complainants have shown that Susannah was illegitimate, the estate of Hannah descended, "in equal parts, to the next of kin in equal degree," namely, to the father and mother, brothers and sisters (if any), and their descendants. Act of March 23, 1819.

For the purpose of showing illegitimacy, reliance is placed upon a deed from James and Fanny Hillman, executed and acknowledged by them in Alleghany county, Pennsylvania, February 19, 1825, to Thomas Osborn. This deed recites:

"Whereas, Hannah Ratcliff, wife of William Ratcliff, of said State of Illinois, daughter and heir of the said James Hillman,

departed this life in the month of October, 1822, leaving the said James Hillman, her father, and Fanny, his wife, her heirs-at-law: Now, for the purpose of vesting said Thomas Osborn, and Susannah, his wife, who is the daughter of said Hannah Ratcliff, with all the real estate, to-wit, lands, tenements, hereditaments, which the said Hannah Ratcliff was possessed at the time of her death, situate and being in the State of Illinois, aforesaid, and for the sum of one dollar to us in hand paid by the said Thomas Osborn at and before the ensealing and delivery hereof, the receipt of which is hereby acknowledged, have granted, bargained and sold to the said Thomas Osborn, and Susannah, his wife, and their heirs and assigns forever, all lands, tenements, hereditaments, of whatever nature or kind, which descended to us at the death of our daughter, Hannah Ratcliff, late of the State of Illinois, deceased."

It is manifest that the recitals of fact in this deed operate by way of estoppel upon Thomas Osborn, and, after its record in the proper county, August 9, 1827, upon his grantees. As was said in *Pinckard* v. *Milmine*, 76 Ill. 453: "We recognize the doctrine of estoppel by the recitals in a deed, and that a party claiming under such deed can not be permitted to deny any fact admitted to exist by such recitals,"—citing *Byrne* v. *Morehouse*, 22 Ill. 603, and *Rigg* v. *Cook*, 4 Gilm. 336; and adding: "The principle of these cases is, that whatever rights legitimately arise on such admitted facts may at all times be asserted, whether it be to obtain or defend the possession of such rights." Thomas Osborn would not have been permitted, nor can the appellees, his remote grantees, now be heard, to deny the facts recited in this deed, namely, that Hannah Hillman and William Ratcliff were man and wife, and that Susannah Osborn was the daughter of Hannah Ratcliff. Hannah Ratcliff was then a married woman, and Susannah Osborn was her only child. In contemplation of law, Susannah is presumed to have been born in lawful wedlock, and this pre-

36—127 ILL.

sumption must prevail until the legal presumption of legitimacy, and which attaches to every child, is overcome by clear and convincing proof; and the burden of showing illegitimacy is, by the law, cast upon those who allege it.

The doctrine announced is fully sustained by the authorities. In *Strode* v. *Magowan's Heirs*, 2 Bush, (Ky.) 621, it is said: "The law presumes that every child in a Christian country is, *prima facie*, the offspring of a lawful, rather than a meretricious, union of the parents, and that, consequently, the mother, either by actual marriage or by cohabitation and recognition, was the lawful wife of the father; and, in the absence of any negative evidence, no supplemental proof of legal marriage will be necessary to legitimate the offspring. Mere rumor is insufficient to bastardize issue, or require positive proof of actual marriage. If the presumption be false, repellant facts may generally be established; and if no such fact can be clearly proved, the presumption, from mere filiation, should stand." So in *Wilkinson* v. *Adam*, 1 Ves. & B. 422, it is said by Lord ELDON that the rule can not be stated too broadly, that the description "child," "son," "issue," and every word of that species, must be taken, *prima facie*, to mean legitimate child, son, issue, and that to this extent all the cases go. So, too, in *Caujolle* v. *Ferrie*, 23 N. Y. 91: "It being shown and conceded that the respondent was the son of the deceased, * * * the presumption of law was, that he was her legitimate son, and those who assume the fact of illegitimacy have cast on them the *onus* of establishing it." And the cases cited by the court go to this extent: that the law is unwilling to bastardize children, and throws the proof on the party who alleges illegitimacy, and in the absence of evidence to the contrary, a child, *eo nomine*, is therefore a legitimate child. Nor does the law require an acknowledged and conceded child to prove an act of marriage to maintain his legitimacy. The presumption and charity of the law are in his favor, and those who wish to bastardize him must make out the fact by clear

and irrefragible proof. The presumption of law is not lightly to be repelled. It is not to be lightly broken in upon, or shaken by a mere balance of probabilities. The evidence for repelling it must be strong, satisfactory and conclusive. And in another case cited, (*Pier* v. *Pier,* 2 H. of Lords Cas. 331,) it is said, "presumptions of this sort in favor of marriage can only be negatived by disproving every reasonable possibility."

The witnesses all affirm that Susannah Osborn was the daughter of Hannah Ratcliff, and the recitals in the deed confirm this; but the deed goes further, and shows that the daughter of the grantors was the wife of William Ratcliff. The witnesses also show that William and Hannah Ratcliff emigrated to Illinois in 1808, and thereafter lived together as husband and wife until the death of Hannah, and it is also shown that in 1816 William Ratcliff, and Hannah, his wife, joined in the execution and acknowledgment of a deed conveying land. It is also shown that Susannah was married to Thomas Osborn in 1807, at the age of twenty-one years, and although there is no evidence as to *when* William Ratcliff became the husband of Hannah Hillman, the testimony of the two sons of Benjamin Hillman, (a brother of Hannah,) that they had heard their father say, when speaking of their aunt, whom the witnesses never saw, on occasions which they could not fix with any distinctness, and in conversations which they could not recall with any clearness, that Hannah had no husband, and that her daughter was illegitimate, does not rise to the dignity of that general repute in the family which the law regards as competent evidence in respect to pedigree, and is insufficient to repel the presumption of marriage. It is not general repute at all,—it is the specific hearsay statement of a single member of a numerous family, and, as such, is altogether too unsatisfactory and inconclusive to overcome the legal presumption of timely marriage between Hannah Hillman and William Ratcliff, and the legitimacy of their child, Susannah. And the testimony of these two nephews of Hannah Ratcliff, speaking,

at most, only as to the repute *in the family of their father*, is all there is in this record to cast the slightest suspicion upon Susannah's legitimacy.

What is here said is not at all affected by the statement in the deed of James and Fanny Hillman, (father and mother of Hannah Hillman,) that upon the death of Hannah Ratcliff she left "the said James Hillman, her father, and Fanny, his wife, her heirs-at-law." Whether they were or were not the heirs-at-law of their deceased daughter, would depend, not upon their naked assertion of heirship, but upon the existence of certain facts. It is impossible that they could have been the heirs-at-law of their deceased daughter, if such daughter left surviving legitimate offspring, or descendants thereof; so that to make their statement of heirship in the deed true, they should have gone further, and bastardized the issue of their daughter, or been in a condition to do so by that character of proof required by the law. So far from doing this, they, by their recitals of fact in the same deed, as we have seen, support the legal presumption of legitimacy.

In any view we have been able to take of the facts disclosed by this record, the conclusion has been forced upon us, and we so hold, that Susannah Osborn was the legitimate daughter of William and Hannah Ratcliff, and took by descent, on the death of her mother, survey No. 764, of which her mother died seized in fee. This being so, upon the death of Susannah Osborn, in 1832, intestate, leaving surviving a husband, and six children born of the marriage, the estate descended to and vested in her children, subject, as the law then stood, to the estate of Thomas Osborn, her surviving husband, as tenant by the curtesy. As such tenant, Thomas Osborn was entitled to the possession, use and enjoyment of survey No. 764 for the term of his life, and which was not determined until his death, June 16, 1863.

Appellant claims to be the owner in fee of thirty-three thirty-fifths of the premises in controversy, by a chain of con-

veyances from the children and descendants of the children of
Susannah Osborn. That the conveyances relied upon had the
effect of vesting in appellant the fractional interest, if any
they had, of such of the heirs of Susannah Osborn as con-
veyed to him or his grantors in the premises in controversy,
is not denied; but it is insisted, on behalf of the village of
Brooklyn, that appellant is not entitled to the relief prayed
for in his cross-bill, because, first, Thomas Osborn was the
owner in fee of survey No. 764; and second, if Thomas Os-
born was not such owner, any claim based upon the title of
Susannah Osborn is barred by lapse of time and by estoppel.

In support of the first position, reliance is placed upon the
deed of February 19, 1825, from James and Fanny Hillman
to Thomas Osborn, and Susannah, his wife. This deed was
inoperative as a conveyance of title acquired by the grantors
by descent from their daughter, Hannah Ratcliff, for the rea-
son, as we have seen, the grantors took nothing by descent.
It is next contended, that Thomas Osborn acquired title by
virtue of a decree of the circuit court of St. Clair county,
and of a commissioner's deed executed in conformity thereto.
That was a proceeding in equity, instituted by Thomas Osborn,
against Jacob Trout and James Ward. The verified bill was
exhibited in August, 1827. Complainant alleged therein, that
by deed of bargain and sale of February 19, 1825, he pur-
chased of James and Fanny Hillman all the lands in Illinois
which they, as father and mother of Hannah Ratcliff, inher-
ited from her; that Hannah Ratcliff died seized in fee of sur-
vey No. 764, but without any lineal legal heir-at-law, whereby
these lands descended in fee to her father, James Hillman.
By proper averments the militia claim of Moredock, its loca-
tion on survey No. 764, and its confirmation to Jacob Trout,
were set out, followed by the allegations, that in consideration
of $100 paid to him by James Ward, for the use of Hannah
Ratcliff, Trout conveyed, by deed of bargain and sale, the
same premises to James Ward, for the use of Hannah Ratcliff,

and that afterwards, by a like deed, Ward conveyed the premises to Hannah Ratcliff, "for whom the militia claim was purchased by the said Ward with her money." The loss or destruction of these deeds, and that they had never been recorded, was alleged; also, that the deed from Ward to Hannah Ratcliff could only be established by William Ratcliff, who had departed the State, and whose residence was unknown, but referred to and exhibited an affidavit of said Ratcliff, showing its execution; that Trout knew Ward had bought the land with the money of Hannah Ratcliff, but refused to make a deed therefor directly to complainant; that Ward had departed this State, and his whereabouts was unknown, and praying a decree that Trout and Ward make to complainant a conveyance that should vest in him the fee, or that it be made by a commissioner, and which should bind Trout and Ward, and their heirs, etc. Trout answered, admitting the conveyance by him to Ward; that he was ready and willing to make another deed, and brought in and tendered a deed for the premises, running to Ward, and admitting that Ward purchased of him for the use of Hannah Ratcliff. By leave of court, the deed tendered by Trout was withdrawn and placed on record. The cause was continued for publication against Ward, and at the next term (March, 1828,) the bill was taken as confessed against Ward, and a decree passed, based on the deposition of one McRoberts and the affidavit of William Ratcliff, directing the execution of a deed to complainant of survey No. 764, vesting in him all the right and title of Trout and Ward, and which deed should be a bar against Ward, "and all claiming under him." A commissioner was named, who, on March 28, 1828, conveyed the premises to Thomas Osborn, in conformity with the decree.

It is hard to understand how an intelligent court could have been induced to render the decree mentioned, upon the facts disclosed. The first material allegation in the bill was untrue. Had the deed of February 19, 1825, from James and Fanny

Hillman, been exhibited (which was not done,) or brought to the knowledge of the court, (which manifestly was not done,) it would have shown, upon its face, that the conveyance was to "Thomas Osborn, and Susannah, his wife, and their heirs and assigns forever." Being husband and wife, Thomas and Susannah were, under this deed, and upon the theory that it was operative as a conveyance, tenants by the entirety, and either was incapable of claiming or holding adversely to the other. This was elementary law, familiar to the distinguished justice who presided at the trial, and to the eminent counsel for the complainant; and it is clear that Susannah Osborn had no notice of this proceeding, or in any way consented thereto. The conveyances from Trout to Ward, and from Ward to Hannah Ratcliff, being lost or destroyed, and never having been recorded, it was proper practice to invoke the aid of a court of equity for the purpose of obtaining renewal deeds. In such application, Susannah Osborn was a necessary party, and no court, with knowledge of her joint interest in the premises, would have retained jurisdiction of the bill unless she was joined as complainant or defendant. Not being a party to this proceeding, and being, as the evidence shows, in the actual possession of the premises, Susannah Osborn's rights, even as the co-tenant of her husband, were not and could not be affected by any decree the court did or might render; and her husband, when he took the deed under this decree, took it both with actual and constructive notice of her rights in the premises, not only as his pretended co-tenant, but of her rights as owner of the fee, as heir-at-law of Hannah Ratcliff. As against Trout and Ward, and as a judicial determination of the fact that Hannah Ratcliff acquired the fee to these premises by a chain of conveyances from the United States, the decree may be binding and conclusive, but as against Susannah Osborn and her heirs, and those claiming through and under them, it is without force or effect. Nor can the deed to Thomas Osborn, acquired under this decree,

amount to color of title, because not acquired in good faith. As Thomas Osborn acquired no interest in survey No. 764 under and by virtue of the deed of February 19, 1825, as before shown, neither did he acquire any interest or estate therein by virtue of this judicial proceeding, or of the deed made in conformity thereto. That deed only purported to convey to him the interest in that survey acquired by Ward from Trout. At the time the bill was filed, decree rendered and deed made, Ward had no interest in the premises. All the interest and estate he ever had, had long before been by him conveyed to Hannah Ratcliff, and vested in her in her lifetime, and on her death passed to her only heir-at-law, Susannah Osborn.

As to the second contention of the village of Brooklyn,—namely, *laches* and estoppel,—it must be observed, as Susannah Osborn died intestate in 1832, seized in fee of survey No. 764, leaving surviving, her husband, Thomas Osborn, and six children born of their marriage, such children took the estate by inheritance, incumbered, however, by a life estate in Thomas Osborn, their father, as tenant by the curtesy. The right of possession was in Thomas Osborn as long as he might live, and it was not until his death, June 16, 1863, that a right of action or of entry accrued to the fee owners. Until the death of the life tenant, no statute of limitations began to run against the heirs of Susannah Osborn or their grantees, and *laches* can only be imputed to them from the time their right of entry accrued. We can not say that appellant, and those through whom he claims, were guilty of *laches* after the death of Thomas Osborn. At his death, the particular premises in controversy were not in the actual possession of any one. They had been formed by accretions by the Mississippi river since 1837. Along the east side lay Water street of the old town of Brooklyn,—a street that the evidence shows had never been used and occupied as a street, either by the old town of Brooklyn or by the more modern village. The land lay low, and was subject to overflow. But in 1873, Louise J. Purdy,

who, by conveyances from the heirs of Susannah Osborn, had acquired a large fractional interest in these premises, under the claim of ownership took possession of these premises in the most open and hostile manner. She built a fence along the north, east and south sides, and erected a house thereon, which was occupied by her tenant. True, the water, years afterwards, washed away her house and fences, but she continued to exercise acts of ownership over the premises, paying the taxes thereon until in 1882, when she sold and conveyed to appellant, and thereafter, and until the commencement of this suit, appellant claimed the ownership to the extent of thirty-three thirty-fifths, and possession thereof. Being in possession, appellant might safely lie by until his possession was invaded or his title attacked.

The whole force of the argument of the village in support of the defense of *laches* is spent in pressing on our attention the fact that during all the years intervening between the death of Susannah Osborn and the filing of appellant's cross-bill, her heirs, and those claiming through them, remained silent. From her death, in 1832, down to the death of her husband, in June, 1863,—thirty years and eight months,—this is certainly true. During all that time, however, they could neither speak nor act. The right of possession was in their father and his grantees, and their right of entry had not accrued, and it was only upon the determination of the intermediate life estate that they were required to speak or act,—nor then, as we have seen, until their rights were attacked or invaded. No word spoken or act performed by Thomas Osborn, or those claiming under him, during the existence of his life estate, could in the least affect the rights of those entitled to the possession upon the termination of his estate. True, Osborn and his immediate grantees, in 1837, and following the forms of the law, laid out and platted a town upon survey No. 764; but it was impossible that he should grant or convey thereby any greater interest in the land than he possessed.

The possession of the streets and alleys of the town by the corporation, during Osborn's life, was in no sense adverse or hostile to those entitled to the possession of the lands on the termination of the life estate. And this is so for the obvious reason, that, pending the right of entry and of possession of the fee owners, the possession of the life tenant and his grantees was lawful, and could, by no legal possibility, become hostile or adverse until the life estate was determined. It is not contended, as we understand, that the village of Brooklyn, after the death of Osborn, had actual possession of the premises in controversy. Indeed, it clearly appears that when Ludwig made his survey, in 1874, at the request of persons acting as village authorities, and made the new plat, he did so according to the old plat, extending it no further westward than to embrace and show Water street, eighty feet wide, and that at that time Ludwig found the lands lying to the westward (the controverted lands) under fence, and an occupied dwelling house thereon. That this was the fence and house erected by Mrs. Purdy, and before spoken of, is unquestioned.

This litigation relates only to the tract of land formed by accretion since the laying out of the village of Brooklyn, and lying west of Water street therein, which street was the western boundary of the village, as platted. Hence the argument of counsel, predicated upon the supposed effect of the holding in this case upon the land included in the village, can not be here considered. It may, however, be said, without impropriety, that it must be apparent, if, as counsel contend, the streets and alleys of the village, and the lots therein, have been in the adverse possession of the village and lot owners since the death of Osborn, in 1863, that the principles and rules applied to the present case might not be held applicable when the question as to the title to such streets, alleys and lots arises, if it ever should arise.

But it is also contended that appellant is estopped by the decision in the case of *Village of Brooklyn v. Smith,* 104 Ill.

429, wherein it is held, upon the record then before the court, that the lands in controversy belonged to the village of Brooklyn, and formed a part of Water street. In that case Smith, a tenant in possession under Mrs. Purdy, sought injunction against the village, to restrain its officers, and licensee, Voise, from interfering with Smith's use of the premises for the purpose of cutting and storing ice thereon. The only parties to the proceeding were Smith, in his character of tenant, the village and Voise. As against Smith, and all claiming through and under him, the decree in that case is final and conclusive. But upon what principle can it be said that Mrs. Purdy, and appellant, claiming through and under her, are bound and concluded by a decree in a cause in which she was not a party? It is only parties, and their privies in blood or estate, that are estopped by a decree or judgment. (*Morris* v. *Hogle*, 37 Ill. 150; *Huls* v. *Buntin*, 47 id. 396.) Parties to a decree, in the eye of the law, are those only who are named as such in the record, and are properly served with process, or enter their appearance, (*Borders* v. *Murphy*, 78 Ill. 81,) while a privy in blood or estate is one who derives his title to the property in question by descent or purchase; and a privy to a judgment or decree is one whose succession to the rights of property thereby affected occurred after the institution of the particular suit, and from a party thereto. Freeman on Judgments, (3d ed.) sec. 162.

It is very clear, when the *Smith case* was before the court, and from the facts as therein disclosed, that there was no adjudication in respect of the rights of the heirs of Susannah Osborn. The language used excludes any such idea. It was there said: "It appears, from the evidence, that Water street was ever regarded by the inhabitants of the village as extending to the river, and so used, with no pretense ever made of any private claim to the contrary, until in 1873, when Mrs. Purdy went upon the river front and fenced a portion of it, claiming title, as her husband says, under deeds from the heirs of Osborn.

No deeds were shown in evidence. But supposing there had been shown deeds from Osborn's heirs, they would have conveyed but Osborn's interest, which, at most, could have been only a one-fifth interest, as one of the five original proprietors. But Osborn left no interest to descend and be conveyed. The acknowledgment by him, and recording of the original plat, had all the force of an express grant to convey from him the land embraced by Water street, and vest it in the corporation of the village. The corporation was the owner in fee of the village." All this is predicated upon the assumption, fully justified by the record then before the court, that Thomas Osborn, and, through him, Collins, Morris, Tabor and Austin, were the owners of the fee when they platted the original town of Brooklyn. The premise admitted, the conclusion drawn is logical, that Thomas Osborn "left no interest to descend and be conveyed." That was true then and is true now. But it does not follow, that because the children of Thomas and Susannah Osborn took, by descent *from their father*, no interest in these premises, the same children did not inherit these premises from their mother. They did take, by descent, survey No. 764, of which their mother died seized, the fee vesting in them at her death; and upon the death of Thomas Osborn, the right of entry and possession accrued to the children of Susannah Osborn or their grantees. Mrs. Purdy is shown to have been such grantee of a large interest in the particular premises,—accretions formed upon premises owned in fee by her grantors,—which interest she appears to have acquired prior to the suit referred to, and in which suit neither she nor her privies in estate were parties. Appellant, claiming through her, is not therefore estopped by former adjudication.

The decree of the circuit court rendered herein is in all things affirmed, except in so far as it dismissed the cross-bill of appellant, Orthwein, and rendered judgment against him for costs, as to which said decree is reversed, and the cause remanded to the circuit court, with directions to find and declare

the share or interest of appellant in and to said land, under conveyances from or through the heirs of Susannah Osborn, and decree the same to him in fee, and make partition of the same accordingly, and for that purpose to permit amendments to said cross-bill or other pleadings, and to cause to be brought into court all such persons as may be deemed necessary, if any are necessary, to the proper rendition of such decree.

*Decree reversed in part and in part affirmed.*