## CLOVER et al. v. CLOVER et al. (No. 6845.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 3, 1923. Rehearing Denied Jan. 24, 1923.)

1. Marriage ⊜⇒40(4)—Cohabitation and acknowledgment held to raise presumption of marriage.

Evidence that a couple had lived with each other as man and wife and had children who were acknowledged by the father raised the presumption that the couple were married and the children born in wedlock.

2. Marriage ⊜⇒50(5)—Evidence that no suspicion attached to cohabitation held to have weight on question of marriage.

Evidence that, during an extended period of cohabitation between a couple, no suspicion attached thereto as to the woman's character, nor afterwards, during a long separation from him, added weight to evidence tending to show marriage.

3. Marriage ⊜⇒50(1)—Failure to find record of no probative force against fact of marriage.

Failure to find any record of a marriage in a county where it was claimed to have occurred was of no probative force against the fact of marriage.

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Trepass to try title by William Clover and others against Paula Moreno de Clover and others. Judgment for defendants, and plaintiffs appeal. Reversed and remanded.

See, also, 224 S. W. 916.

John L. Dannelley, of Laredo, for appellants.

Hamilton & Phelps and John A. Pope, Raymond & Pope, all of Laredo, for appellees.

FLY, C. J. This is an action of trespass to try title to lots 1, 2, 3, and 4 in block 168 and lots 9 and 10 in block 120 in the city of Laredo, and also to recover 30 shares of stock in the Southern Pacific Railway Company, 10 shares of stock in the Surety Oil & Refining Company, 25 shares of stock in the Hoffman Oil & Refining Company, 10 shares of stock in the Third Avenue Railway Company of New York, 12 shares of stock in the East Beaumont Oil & Gas Company and 24 shares of stock in the Wabash Railroad Company. The suit was instituted by William Clover, Carrie Clover Fitzgerald, joined by her husband, D. J. Fitzgerald, and Florence Wallace Edwards, joined by her husband, Eugene Edwards, appellants, against Paula Moreno de Clover and Patricio Clover, appellees. The parties claim the property through W. C. Clover, deceased.

Appellants alleged that on or about March 1, 1883, Olive Elizabeth Wallace, then a widow with one child, Florence Wallace, now Florence Wallace Edwards, was duly married to W. C. Clover which marriage was not dissolved until the death of Olive Elizabeth Clover on September 30, 1912; that during that marital relation the property described was accumulated by the spouses and became the community property of W. C. Clover and Olive Elizabeth Clover, and there was no partition of the same; that said Olive Elizabeth Clover died intestate leaving surviving her her three children, Florence Wallace, child of the first marriage, and William Clover and Carrie Clover, of the second

marriage, who are the appellants herein, that said W. C. Clover died intestate in Laredo, Webb county, Tex., on or about February 1, 1919, leaving as his only heirs William Clover and Carrie Fitzgerald and the said Patricio Clover. Appellees claim that Paula Moreno de Clover entered into a common-law marriage with W. C. Clover, on or about the year 1888 and lived with him as his wife continuously until his death on or about February 1, 1919, that in February 1914, W. C. Clover and Paula Moreno de Clover were duly and legally married to each other by authority of a duly issued marriage license. It was alleged that Patricio Clover was born during the existence of the common-law marriage, being the offspring of W. C. Clover and Paula Moreno de Clover. The cause was tried by the court, without the aid of a jury, and judgment rendered for all the property in favor of appellees.

It was established without controversy that the real estate was acquired by W. C. Clover in 1888, and if Olive Elizabeth Clover was ever the wife of W. C. Clover she maintained that relation from March, 1883, until the time of her death on September 30, 1912, and that she left surviving her Florence, Carrie, and William, the appellants. W. C. Clover died February 1, 1919. Appellee Patricio Clover is a legal heir of W. C. Clover, deceased. It was also shown that, after the death of Olive Elizabeth, W. C. Clover had no other income than that arising from the rents of the real property sued for, and no partition of the community property of Olive Elizabeth and W. C. Clover, if there was any such community property, ever took place, and appellants never received any part of the rents.

The real vital question in the case is as to the marriage of W. C. Clover to Olive Elizabeth Wallace in 1883. If that marriage took place, then all questions as to any common-law marriage are destroyed, for if that marriage was consummated it continued in existence until the death of Olive Elizabeth on September 30, 1912. No marriage, common-law or statutory, could have been entered into by W. C. Clover with Paula Moreno de Clover, or any other woman, during the existence of the marriage entered into 1883 and ended in September, 1912. Around the marriage of 1883 revolves every issue in the case, and it is useless to consider any other marriage, if the marriage of 1883 was entered into. If W. C. Clover and Olive Elizabeth Wallace were not married to each other in 1883, the appellants could not recover, and it would be a matter of no importance whether Paula Moreno de Clover entered into a common-law marriage with W. C. Clover or not. Appellants could only recover on the strength of their own title, and not on the weakness of the title of appellees. If appellants have no title, the legal rights of appellees in the land would be fixed and established by the legal marriage of W. C. Clover and Paula Moreno in 1914, whether any common-law marriage had existed prior to that time or not. The testimony, salacious and exciting as it may be in connection with the various marriages and near marriages so lavishly indulged in by the principal actors in the domestic drama played by them in the days of their youth, when the evil days of accounting for the deeds done in the body had not come, might be interesting reading, but can add nothing to the force and effect of this opinion.

A review will be made of the evidence submitted to show a legal marriage between W. C. Clover and Olive Elizabeth Wallace in 1883, upon which the judgment must depend. The evidence shows conclusively that Carrie Clover Fitzgerald and William Clover were the children of W. C. Clover and Olive Elizabeth Wallace. The evidence, direct and circumstantial, tended to prove the parentage of the two children as stated. In his letters W. C. Clover used feeling and very affectionate terms, and recognized his relationship to the two children. In 1904, he wrote to Mrs. Carrie Fitzgerald telling her:

"I don't want you to forget that you are my own flesh and blood and that you are my child. I have neglected you shamefully, but I have suffered for it—so we all do."

He also wrote a letter to Mrs. Edwards calling her "Dear Babe," in which he said he loved the two girls very much and spoke of William Clover in affectionate and kindly terms and sent his love to the mother and Carrie and William. That was in 1905, and again he wrote to Mrs. Edwards saying:

"I have figured out all of your ages—you January 30. 1881, Nims [Carrie] 1883, your brother 1885."

He asks her:

"Do you really remember me? You were such a dear little toad. You were too small, I guess. Nims was of course too small. She was the prettiest baby I ever saw. And now I am afraid she don't care for me much. Well time surely flies. Tell Nims to write me a good long letter. I am waiting for her picture with impatience."

He received the pictures and replied in a very affectionate letter full of solicitude for Carrie and William. This character of correspondence was kept up by W. C. Clover up to 1912, and he often sent his love to Mrs. Wallace Clover and the two children. In writing to his daughter, Carrie, he tells her:

"You was a very lovely baby and I loved you very much, and I do yet. See how I saved your picture and a lock of your hair. You were larger than when I got the hair. Well I have it yet put away in a safe place."

He signed the letter "Your affectionate Papa., W. C. C." In that letter he sent his love to the mother of the children and said "tell her I wont forget her soon." Olive Elizabeth, after leaving Clover, went by the name of Wallace, and had her children baptized by that name in the Cathedral at San Antonio. In the notice of her death she was called Olive E. Wallace. All of the evidence showed that Carrie and William were the offspring of W C. Clover and Olive Elizabeth Clover. There was testimony tending to show that W. C. Clover spoke of having a wife and two children living outside of Laredo in the north. That was in the last part of the years between 1880 and 1890. A Mexican, named Andres Cuellar, testified that he was present when W. C. Clover was married to an American woman in the early part of 1883 or last part of 1882. No record of a marriage license between W. C. Clover and Olive Elizabeth Wallace could be found in Starr county, Tex. A judgment of divorce between W. C. Clover and Ida I. Clover, dated February 13, 1883, was introduced in evidence by appellees. To meet the facts proven by appellants showing the living together of W. C. Clover and Olive Elizabeth Wallace and the birth of their children, appellees sought to prove a common-law marriage between W. C. Clover and Paula Moreno, and showed that while writing loving letters to children of the American woman with whom he had cohabited, he was writing just as loving ones to the Mexican woman who had borne him children, and was also writing to his Mexican children. This correspondence clearly indicated that W. C. Clover was leading a decidedly double life and was pouring out terms of affection to the children of two women to neither of whom he had ever been married, if the theory of appellees is correct as to the marriage relationship having never existed between Clover and Mrs. Wallace. It is argued from the fact that deceased wrote to Paula Moreno, calling her his "only good wife, mother of my children," that she must have been his wife, but the uncontradicted proof shows that about the same time he was confiding to residents of Laredo that he had a wife and two children in St. Louis. It may be that he labored under the mistaken idea that he had more than one wife, and that Paula was his "only good wife," but through all the years that he lived with Paula he made no effort to obtain a divorce from Olive Elizabeth, but waited until he had been informed that Olive Elizabeth was dead before he gave his name to Paula and legitimatized her children. This is a strong circumstance to show that he recognized the marriage relation existing between him and Olive Elizabeth, which he did not seek to dissolve and which he respected to such an extent as to not lay himself open to a charge of bigamy. It is argued that, as W. C. Clover in his letters to his children never sent his love "to my wife" but "your mama," this evidenced the fact that he did not recognize that she was his wife. If a man in writing to his children ever speaks to them of their mother as "my wife," it has never been brought to light. It would have been a most unnatural and most singular proceeding for W. C. Clover to have written his children to give his love "to my wife."

The facts showed that Paula, not only thought she was the lawful wife of one Neofito Barboza, with whom she had lived as his wife prior to living with Clover, and that the latter had promised to obtain a divorce for her from Barboza. Paula did not claim to have been married to Clover until 1914. This testimony was given by Paula in a case in the federal court on November 21, 1921. She accounted for the failure of Clover to marry her by saying, "He had his ideas." She called herself Paula Moreno until 1914, and she called her children by the name of Barboza. She swore in the probate court that she had married Neofito Barboza, and had never been divorced from him.

[1-3] The proof showing conclusively that W. C. Clover and Olive Elizabeth had lived with each other as man and wife and that Carrie and William were the fruits of that cohabitation, the legal presumption would arise that they were born in lawful wedlock. Filiation, that to the paternity of a child, when established, raises the presumption that the child was born in wedlock. The law is unwilling to bastardize children, and does not require an acknowledged and conceded child to prove a marriage to maintain his legitimacy. 3 R. C. L. 725. As said in the case of Orthwein v. Thomas, 127 Ill. 554, 21 N. E. 430, 4 L. R. A. 434, 11 Am. St. Rep. 159:

"The presumption and charity of the law are in his favor, and those who wish to bastardize him must make out the fact by clear and irrefragable proof; that the presumption of law is not lightly to be repelled; it is not to be lightly broken in upon, or shaken by a mere balance of probabilities. The evidence for repelling it must be strong, satisfactory and conclusive."

The facts of this case show paternity of Carrie and William in W. C. Clover as clearly as the fact of paternity is ever established, and weight is added to the testimony by the fact that there was no breath of suspicion upon the character of Olive Elizabeth while she lived with W. C. Clover nor during the many years she lived after her separation from him. The record fails to disclose any but a pure, respectable life being led by her. In re Pickens' Estate, 163 Pa. 14, 29 Atl. 875, 25 L. R. A. 477; Goss v. Froman, 89 Ky. 318, 12 S. W. 387, 8 L. R A. 102; Woodward v. Blue, 107 N. C. 407, 12

S. E. 453, 10 L. R. A. 662, 22 Am. St. Rep. 897. There was nothing reprehensible on her part before she married Clover shown by valid testimony, but on the other hand it indicates that she was lawfully married to Wallace, and that he had died. Calling Carrie and William by the name of Wallace could not change their paternity. All the facts show that they were the children of W. C. Clover. The claim that Carrie was born within six months after W. C. Clover was divorced from Ida I. Clover is commented on, but that did not tend to show that Carrie was not the daughter of W. C. Clover and born in lawful wedlock. He believed that she was his daughter and wrote her that she was "a very lovely baby and I loved you very much and I do yet." Again he wrote Mrs. Edwards: "I wish you had written more about Carrie. She was so pretty when she was a little baby. * * * I love that little girl as much as ever." He wrote Carrie "you are my own flesh and blood" and "you are my child." He had no doubt about the paternity of the child, and the presumption would prevail that she was born in wedlock. The failure to find any record of the marriage in Starr county had no probative force in showing there was no marriage. The license might have been issued in any other county in Texas. It was not necessary that the license to marry be issued in the county in which the marriage took place.

The probate proceedings as to the will of W. C. Clover was not competent for any purpose in this suit, and neither was the baptismal certificate of Francisca, daughter of Isabel Wallace. These matters merely cumber the record and have no bearing on the issues of this case.

Because we do not think the facts support the judgment, and because of errors in the admission of testimony, the judgment is reversed, and the cause remanded.