**BURRELL v. WESTBROOK et al.**

No. 5450.

Court of Civil Appeals of Texas. Amarillo.

June 1, 1942.

Rehearing Denied July 6, 1942.

696

Jack T. Life, of Athens, for appellant.

Bishop & Parsons and W. D. Justice, all of Athens, for appellees.

STOKES, Justice.

This is an appeal from a final order of the District Court of Henderson County revoking letters of administration granted by the county court to Julia Burrell on the estate of Marion Barker, deceased, and issuing to Marion Westbrook letters of administration upon his estate. The record shows that Julia Burrell is a surviving sister of Marion Barker, and the county court appointed her administratrix of the estate on February 9, 1939. In her application Marion Westbrook, whose maiden name was Marion Graham, alleged there were no debts owing by the estate and no necessity existed for administration thereon but that if administration was necessary she was a granddaughter of Marion Barker; that she

and her brother, Gilson Graham, were his only descendants and that she had a prior right to administer upon his estate. Appellant, Julia Burrell, answered the application by denying generally the allegations therein and denying that Marion Westbrook and her brother were heirs of Marion Barker, deceased. She further alleged that although citation upon her application was issued and served, as required by law, the appellee, Marion Westbrook, failed to appear and contest the same and that by reason thereof she had waived any prior right she might have to be appointed as administratrix of the estate. After a hearing in the county court upon the application of appellee to be substituted as administratrix, an order was entered denying the same, from which she appealed to the district court where the case was duly tried and submitted to a jury upon the issue of whether a common law marriage was consummated between Marion Barker and Dorcas Stovall who appellee alleged were her grandparents. The jury found they did enter into a mutual agreement presently to live together as husband and wife; that pursuant to such agreement they lived together as husband and wife and that they held themselves out to the public as such. Based upon the verdict of the jury, the district court entered judgment revoking the letters theretofore granted by the county court to appellant, Julia Burrell, and appointed appellee administratrix of the estate.

Appellant duly excepted to the judgment and presents the case on appeal to this Court, contending, first, that the court erred in overruling her objections to the introduction in evidence of an application made by Marion Barker to be appointed guardian of appellee and her brother, and the order of the court appointing him as such; secondly, that the court erred in overruling her objections to certain testimony; and, thirdly, that the court erred in overruling her motions for a peremptory instruction and for judgment non obstante veredicto, and in rendering judgment in favor of the appellee, because the evidence was wholly insufficient to establish a common law marriage between Marion Barker and Dorcas Stovall, the alleged grandparents of appellee.

We find no merit in the first contention presented by appellant. The case presented a sharp controversy between the parties over the question of whether appel-

lee is a grandchild of Marion Barker and Dorcas Stovall, appellee contending that they consummated a common law marriage, lived together as husband and wife for 34 years, and that her mother, Pauline Barker, who married Clay Graham, was the daughter of Marion Barker and Dorcas Stovall. In order to establish this contention appellee offered in evidence and, over the objection of appellant, the court admitted, an application filed July 1, 1925, in the County Court of Henderson County by Marion Barker for letters of temporary guardianship of the estate of Gilson Graham and Marion Graham, alleged to be six and seven years of age, respectively. The application alleged that the minors lived in Henderson County and had property located therein of the estimated value of $750. It alleged that Dorcas Stovall was the grandmother of Marion and Gilson Graham and that she died April 24, 1925, leaving two insurance policies in which the two children were beneficiaries, one of such policies being in the sum of $135 and the other in the sum of $500. The application further stated that Marion Barker was qualified to be appointed as such guardian because he was the grandfather of said minors, and the name, M. F. Barker, was signed to it by his attorney. The application was presented to the court, granted by the court the day it was filed, and on the same day M. F. Barker executed and filed his bond as required by the order and took the oath as guardian in the form provided by the statute. The principal objections of appellant to the introduction of the application and order were that the application was not signed by Marion Barker but by his counsel; that it was a mere ex parte statement; and that it was not sworn to by him. The application, the order of the county court, and the oath and bond in the guardianship were introduced as proof of the allegation that appellee was the granddaughter of Marion Barker and therefore had a prior right to administer upon his estate. The testimony shows that both Marion Barker and Dorcas Stovall were dead. It has long been the rule in this State that declarations or statements concerning pedigree constitute a recognized exception to the hearsay evidence rule. Such evidence is considered competent when based upon a statement made by a declarant having knowledge of the facts but who may be dead or otherwise unobtainable. If hearsay evidence is admissible under such circumstances, then, certainly, a written declaration of the declarant would be admissible. The rule is restricted to the declarations of deceased persons who were related by blood or marriage and therefore interested in the lineage in question. Fowler et al. v. Simpson, 79 Tex. 611, 15 S.W. 682, 23 Am.St.Rep. 370; Lowder v. Schluter, 78 Tex. 103, 14 S.W. 205; Davidson v. Wallingford, 88 Tex. 619, 32 S.W. 1030; Smith et al. v. Lynn, Tex.Civ.App., 152 S.W.2d 838. The fact that the application was not signed in person by Marion Barker is of no significance. When he executed the bond and took the oath as guardian he confirmed the application and ratified the allegations contained in it.

The second contention of appellant is that the court erred in overruling her objection to the testimony of Clay Graham to the effect that when he asked Marion and Dorcas for the hand of their daughter Pauline, Marion told him he wanted the witness to treat Pauline the same way he (Marion) had treated his wife, and that Marion was referring to Dorcas as his wife. The objection was that the statement of the witness that Marion was referring to Dorcas as his wife was a conclusion of the witness. When appellant objected to the testimony on that ground, the witness stated, in effect, that Marion expressed Dorcas' name in connection with the admonition. The testimony was clearly admissible because it was an indication by both Marion and Dorcas that they recognized each other as husband and wife, a question sharply contested by the appellant. The assignment of error will therefore be overruled.

The third contention raises the principal question in the case, namely, that the evidence was not sufficient to establish a common law marriage between Marion Barker and Dorcas Stovall. If Marion and Dorcas were husband and wife it was by virtue of a common law marriage, since no witness testified, nor was there any evidence to show, that their union was solemnized by any nuptial ceremony. It is the contention of appellee that her grandparents consummated a common law marriage; that they lived together for many years and that her mother, Pauline, was the daughter of Marion and Dorcas. Appellant does not seriously dispute the contention that Pauline Barker, the mother of appellee, was the daughter

of Marion and Dorcas, but she strenuously contends that the relationship between the grandparents was that only of continuous illicit cohabitation, and that there is no testimony in the record of sufficient probative force to warrant the conclusion that a common law marriage was ever consummated between them. The record is voluminous, the statement of facts consisting of 300 pages, and to analyze all of it would extend this opinion beyond reasonable proportions. It is shown, however, that about the year 1891, Dorcas Stovall was living in the servants' house of C. H. Coleman at Athens and was employed as a domestic servant for his family. A few months after her employment began, Marion Barker was employed by the Colemans as manservant about the premises. The servants' house consisted of two rooms, and a number of witnesses testified that there was only one bed in the house and that Marion and Dorcas then began to live together in all respects as husbands and wives ordinarily do. It was shown that they continued this manner of life for eight or nine years when Dorcas became pregnant and they moved to another part of town where they continued to live together in a rented house. Pauline was born there and a short time thereafter Dorcas purchased a small house of three rooms where she and Marion reared their daughter Pauline and lived together during the remainder of Dorcas' life. Marion was employed at the Coleman brickyard for many years and during all of that time he purchased the groceries and other household necessities, and Dorcas did the cooking and performed the other household duties in the same manner that housewives usually discharge them. Another child was born to them but it died while very young. Marion provided for its funeral and burial and he and Dorcas together attended the ceremonies. Pauline entered school and through her school years she lived in the house with Marion and Dorcas to whom she always referred, and whom she always addressed, as "mamma" and "daddy." After Pauline married Clay Graham and their two children, Marion and Gilson, were born, they separated. About a year after their separation Pauline died and Marion Barker and Dorcas Stovall made provision for her funeral and burial and attended these ceremonies. In 1925 Dorcas became afflicted and a surgical operation became necessary. Marion employed an attendant to go with her to a sanitarium at Jacksonville, paid all of the expenses of the operation and hospital bill, and when she died he had the body returned to Athens, arranged for the funeral and burial, paid all of the expenses therefor and attended those ceremonies as any other husband would do. During all of this time, from 1891 to 1925, a period of 34 years, Marion and Dorcas lived together and conducted themselves in all respects as married people usually do. They were visited in their home by their friends, and no witness testified that either of them ever lived or cohabitated with any other person during all of that time. It is true, as contended by appellant, the record fails to show that Marion ever introduced Dorcas to any person as his wife or that Dorcas ever introduced Marion as her husband, but seventeen years had elapsed since the death of Dorcas, and we do not deem it strange that after that long interval no witness seemed to remember such an incident. When Pauline and Clay Graham decided to be married, Clay procured the consent of her parents, Marion and Dorcas. Clay testified that in the conversation Marion told him that he wanted Clay to treat Pauline the same way that he, Marion, had treated his wife. He said that Marion called the name of Dorcas in connection with this admonition. It seems that Dorcas was known throughout her life as Dorcas Stovall and that she never openly assumed the name of Barker. Appellant contends that this is significant and strongly indicates that no marriage relationship was ever recognized by her. The record shows that she and Marion were ignorant negroes and that throughout her life Dorcas was employed as a servant. It is the common practice of employers of such servants, and others, to refer to them by their given names, and while this was a matter which, under other circumstances, would probably bear significance and indicate the absence of her recognition of the marital state, yet in the face of the long continued conduct of the parties indicating otherwise, it is by no means convincing and can not be considered more than a mere incident for the consideration of the jury in arriving at their verdict.

■ The proof shows conclusively that Marion and Dorcas lived together without material interruption and that each per-

formed the duties usually devolving upon him as a connubial partner. The relationship thus continued throughout the entire adult life of Dorcas and practically throughout the adult life of Marion. Neither of them, during all of that time, lived with any other person, and no witness testified that during their cohabitation either did any act or pursued any course of conduct that would indicate the marriage relation between them was not genuine nor considered by them as sacred in every respect. Pauline, their daughter, was known as Pauline Barker. She was the fruit of the cohabitation of Marion and Dorcas and, under such circumstances, the legal presumption arises that she was born in lawful wedlock. As said by Chief Justice Fly, speaking for the Court of Civil Appeals of the Fourth District, in the case of Clover v. Clover, Tex.Civ.App., 247 S.W. 300, 302.

"The law is unwilling to bastardize children, and does not require an acknowledged and conceded child to prove a marriage to maintain his legitimacy."

By quotation he approved the holding of the Supreme Court of Illinois in the case of Orthwein v. Thomas, 127 Ill. 554, 21 N.E. 430, 432, 4 L.R.A. 434, 11 Am.St. Rep 159, as follows: " 'The presumption and charity of the law are in his favor, and those who wish to bastardize him must make out the fact by clear and irrefragable proof; that the presumption of law is not lightly to be repelled; it is not to be lightly broken in upon, or shaken by a mere balance of probabilities. The evidence for repelling it must be strong, satisfactory, and conclusive.' " See, also, Humble Oil & Refining Co. v. Jeffrey, Tex.Civ.App., 38 S.W.2d 374; Wingfield v. Pool, Tex.Civ.App., 38 S.W.2d 422; De Beque v. Ligon, Tex.Com.App., 292 S.W. 157. The paternity of Pauline, the mother of appellee, was established beyond question by the testimony. All the facts show that she was the daughter of Marion and Dorcas and, as we have said, no witness cast any suspicion whatever upon the conduct of either Marion or Dorcas during the entire 34 years of their coverture. In our opinion, the testimony was amply sufficient to support the finding of the jury to the effect that a common law marriage existed and was recognized by both of them. Appellant testified that at some time after the inception of the relationship between Marion and Dorcas in the Coleman servants' house, Dorcas requested her to approach Marion and induce him to marry her. She said she did so and that Marion flatly refused, stating that he never intended to marry anyone and that he would die and go to hell before he would do it. Similar testimony was given by two other witnesses and it was undisputed. Appellant contends that it should be accepted as conclusive evidence that no marriage was ever consummated or recognized by Marion and Dorcas. The testimony came from the brother, sister, and nephew of Marion Barker. They were interested in the litigation to the extent that if appellee and her brother were not entitled to the property of Marion's estate by virtue of being his lawful grandchildren, these witnesses, along with others, would inherit it. Although it was not disputed, the jury was not compelled to accept it as true. Even if it was true, however, it did not establish the fact that no common law marriage then existed between them. The testimony was admitted by the court and was before the jury in their deliberation. They found against the appellant and, as we have said, the verdict is amply supported by the testimony in the case.

We have carefully considered all of the assignments of error and propositions presented by appellant and, in our opinion, no reversible error is shown. The judgment of the court below will therefore be affirmed.