ANDREW ANDERSON, APPELLANT, VS. HENRY P. NORTHROP, ET AL, APPELLEES.

TRUSTS—LIMITATION—ACCOUNTING—LACHES.

1. A. died in 1839, leaving a will of which C., his surviving widow, was made sole executrix, and by which she was given a life estate in all of his property, real and personal, with remainder over in fee to all of his children share and share alike. There were four children, three by the testator's first marriage, and one by his surviving widow. C., as executrix, took possession and control of all the properties, and died in 1881, without having been discharged as executrix, and died in possession of a considerable portion of the realty of her testator and some of the personality in kind. At her death she left a will by which her son, who was also one of the remaindermen under her testator's will, was made her sole executor and devisee of her estate. In 1882 the heirs-at-law of A's children by his first marriage brought suit in equity against C's executor for an accounting generally, for all the properties that went into her hands as executrix of A's will, and for restitution of their respective shares thereof under said will. The suit was resisted on the ground that C., as executrix, in 1851, under an order of the probate court, had sold the realty for the payment of debts of the estate of A., and that F., at such sale had purchased the property, and shortly afterwards had reconveyed it to her in fee in her own individual right. That the rights and interests of the complainants as reversioners under A's will were

thereby extinguished, and that the complainants were barred of any remedy by the express provisions of the statute of limitations, and also by laches : *Held*, That C., as executrix of A's will, was trustee of an express or direct trust; and that, as she had never been discharged as such executrix, she continued to be such trustee up to the date of her death; and that her executor after her decease became trustee in her stead and was charged with all of her responsibilities and liabilities as such trustee; and that the relief sought against her and her successor in the trust by the *cestui que trustents* was expressly exempted from any bar of the statute of limitations; *Held further*, That because of the fact that C., under A's will, was executrix thereof and had the right to a life estate in all of his property, and did in fact continuously possess the same from the time of his death to the date of her own decease, the complainants, as remaindermen and *cestui que trustents*, had the right to look upon her continuous possession of the properties as being in right of her executorship, or in right of her life tenancy as created by such will, and were thereby excused, until after her decease, from making inquiry or search for any other title *in her* than the one by which she first took such possession; and that they were not in laches for their failure until after her decease to assail a title hostile to their own, acquired *by her* during her lifetime and while she was trustee over the same, in the absence, at least, of clear proof that they had prior *actual* knowledge of the repudiation by her of her trust and rights as life tenant, and of the acquisition and assertion by her of such adverse title in herself; and that the *onus* of proving such actual knowledge in them is upon the party urging laches as a defense.

2. Where the allegations of a bill filed by the heirs of an estate against the executrix thereof for an accounting, when considered as a whole, charge that more than enough personal assets went into the executrix's hands to pay all lawful debts of the deceased without resort to the realty, and that the executrix wasted the estate and absorbed and appropriated its properties to herself individually, and purchased properties in

her own name with its assets ; and that she had no property of her own except such as she derived from the estate ; and that while the estate was wasting away she was purchasing valuable properties in her own name ; and that she procured an order from the probate court for the sale of the realty of the estate for the alleged purpose of paying debts thereof ; and under said order did sell the same ; and that her intimate friend and counselor bid off the property at such sale for $1,640. and within a few days thereafter reconveyed the same property to her individually for an expressed consideration of $1,660, and that said transactions were contrived to defeat the will of her testator ; such allegations sufficiently make out a case of fraud in reference to the property thus acquired by the executrix to require an answer from her, and to authorize inquiry by the court into the transactions mentioned, and if sustained by the proofs, to warrant relief.

3. Where a party holding the legal title as trustee to real estate dies, his executors become clothed with his duties and responsibilities as such trustee, and they are proper parties to any litigation affecting the rights of their *cestuis que trust* in the subject-matter of the trust.

4. Where a reversionary estate remains in the possession of the executrix of such estate, who, by the will creating the reversions, is also given a life tenancy in such estate, the statute of limitation will not run against the remaindermen in favor of an adverse title acquired *by her* to the properties held in trust or as life tenant until after her decease, unless, at least, there be clear proof of prior *actual* knowledge brought directly home to them of the repudiation by her of her trust, and of the abandonment by her of her claims as life tenant, and of the acquisition and open assertion by her of such adverse title.

5. No valid final discharge can be granted by the county, or probate, court to an executor or administrator until after *six months'* notice of the intended application for such discharge has been duly published in one or more gazettes or newspapers published

nearest the place where the letters were granted. The publication of such notice by *posting*, the law does not contemplate or recognize.

6. Laches is a neglect to do something that, by law, a man is obliged or in duty bound to do. The application by the courts of the doctrine of laches depends upon the circumstances of each particular case.

7. In cases of continuing trusts, that are strictly such and recognized and enforced in courts of equity only, so long as the relation of trustee and *cestui que trust* continues to exist, no length of time will bar the *cestui que trust* of his rights in the subject of the trust as against the trustee, unless circumstances exist to raise a presumption from lapse of time of an extinguishment of the trust, or unless there has been an open denial or repudiation of the trust brought home to the knowledge of the *cestui que trust* which would require him to act as upon an asserted adverse title.

Where the heirs of an estate neglect to institute proceedings for an accounting against an executor for more than forty years after the executor qualifies as such, and until after such executor is dead, and until all witnesses conversant with his actings as executor are dead, and until the record and other evidences of the administration have been lost or destroyed, laches will be attributed to them to the extent that the court will deny them a strict and minute accounting from such executor for the personalty, at least of such estate that has disappeared, and of which no certain and positive accounting can be had.

9. Every fact essential to a plaintiff's title to maintain his bill and obtain the relief asked, must be stated in the bill, otherwise the defect will be fatal. No facts are properly in issue unless charged in the bill; and no proofs can generally be offered of

facts not alleged in the bill; nor can relief be granted for matters not charged, although they may be apparent from other parts of the pleadings and evidence.

10. If sufficient personal assets go into the hands of an executor fully to pay all of the debts of the testator, then there is no necessity or authority in law for a sale of the estate's realty for the payment of debts; and if such executor, instead of applying the personal assets to the payment of debts, misapplies them to other purposes, and misappropriates them to his own uses, and afterwards procures an order for the sale of the realty for the payment of debts that should have been paid with the personalty, then, under such circumstances, such sale of the realty is a fraud in law as between such executor and the heirs-at-law, no matter how regular upon their face the proceedings for such sale may appear, and he should not be permitted to derive any benefit from such sale as purchaser of the property sold.

11. Where an executor purchases the property of a mortgagor at a tax sale thereof that is covered by a mortgage for a large amount due to the estate of his testator, and takes a tax deed thereto to himself in his own right, and then makes no effort to enforce the mortgage thereon that he holds as executor, such tax purchase *held*, to be in trust and to enure to the benefit of the heirs-at-law of the estate of such mortgagee.

12. Where an executor enforces in the courts a vendor's lien enuring to his testator's estate, and at the judicial sale under such proceedings purchased the property and took the title to himself individually without accounting for the amount bid by him for the same at such sale: *Held*, under the circumstances of this case, that such purchase was in trust and should enure to the benefit of the heirs-at-law.

13. Where some of the heirs-at-law of an estate do not join actively as complainants with other heirs having the same and equal rights and interests with themselves, in a litigation against the executor of such estate for an accounting and for an adju_

Andrew Anderson v. Henry P. Northrop et al.—Opinion of Court.

dication of the rights of all persons interested, and such heirs are made parties defendant, that their rights might be adjudicated, such failure to participate actively as complainants in the litigation will not preclude them of their rights as heirs-at-law, or be held to be a waiver of such rights.

Appeal from the Circuit Court for St. Johns county.

The facts of the case are stated in the opinion.

*C. M. Cooper* for Appellant.

*Fleming & Daniel, A. W. Cockrell & Son*, and *C. B. Northrop* for Appellees.

TAYLOR, J. :

From the bill and the admissions of the answer it appears that Andrew Anderson, Sr., father of the appellant, died in St. Augustine, Florida, on or about the 9th of November, A. D. 1839, leaving a last will and testament, in which the testator's wife, Clarissa C. Anderson, who survived him, was named sole executrix. That this will was duly probated and admitted to record; and that she qualified and acted as executrix thereof. By this will the said Clarissa C. was not only made sole executrix, but was given a life estate in all of the testator's property, real and personal, with remainder over in fee to the children of the testator share and share alike as tenants in common, and not as joint tenants, and to their respective heirs, executors, administrators and assigns forever

That the testator left surviving him four children, three daughters by a former marriage, and one son, Andrew Anderson, the appellant, who is the only issue of the marriage with the said Clarissa C. That Mrs. Anderson, the executrix, departed this life at St. Augustine, Florida, on the 23d of June, A. D. 1881, leaving a last will and testament in which her son, Andrew, the appellant, is made executor, and by it he is given in the event of his surviving his mother, all of her property, real and personal. Her will was duly probated and her said executor duly qualified as such. The litigation before us was commenced by bill in equity filed by the heirs-at-law of Hannah Eliza Northrop and Emily Taylor, two of the daughters of the elder Andrew Anderson, against Andrew Anderson, as executor of his mother, Clarissa C., deceased, and in his own right, and against the husband and children of Mary Crafts, deceased, the third daughter of said Andrew Anderson, Sr., and their trustees created by ante-nuptial settlements. No relief is prayed in the bill against any of the defendants except Andrew Anderson, the other defendants being made parties that their rights as devisees of the elder Anderson might be adjudicated. Andrew Anderson, as such executor of Clarissa C., and in his own behalf alone, answered the bill, and the case is appealed here by him from the decree rendered against him as executor of his mother, the said Clarissa C., deceased.

By agreement and consent in the record of the counsel for all parties, complainants and defendants, the representative capacity, the descent and relationship of the complainants and defendants, the marriage-settlements, marriages, births and deaths as alleged in the bill are admitted to be true. The exhibits attached to and referred to in the bill, amended bill and answer are also admitted by agreement without further proof of their authenticity as true copies of the originals as alleged. So that there is no controversy between the parties as to these matters so admitted.

In the answer of the defendant to the bill there is a demurrer raising the issue whether the bill contains sufficient allegations of fraud on the part of Clarissa C. Anderson, as executrix of Andrew Anderson, Sr., and as life tenant under his will, in the disposition made by her of the properties of her testator that are sought to be avoided and overturned by the bill, in order to require an answer thereto by the defendant, or to authorize any relief by reason thereof. The appellant contends that the bill does not contain a sufficient definite allegation of facts to constitute fraud in the acts of the executrix, or that will authorize inquiry therein, or any relief by reason thereof. We will dispose of this issue first, as it concerns the pleadings in the cause. The following allegations of fact, in substance, set forth in the bill, must be considered in their proper connection and as to their legal effect, if true, in the consideration of this point:

1st. The bill alleges that the elder Anderson died leaving a will that was duly probated, and that Clarissa C. did qualify as sole executrix thereof.

2d. That by said will the said Clarissa was made devisee for her natural life only of all his properties, real and personal, with remainder over to all of the children of the elder Anderson in fee.

3d. That the personal estate of the testator that went into her hands in her dual character as executrix and life tenant was appraised at over $20,000, besides debts due the estate amounting to over $7,000, and other personal property to which no definite valuation was attached. And that besides the personalty the said testator at the time of his death was seized and possessed of much valuable real property in St. Johns county, Florida, that was productive and amply sufficient to support the life tenant and pay expenses of administration.

4th. That the debts of the said Anderson, Sr., at the time of his death amounted, on complainants' information and belief, to less than $5,000, and that said executrix had sufficient available assets at her command to pay all lawful debts and claims against the estate without selling any of the real estate or personal property.

5th. That the said Clarrissa C., when her husband died, had no property of her own, nor did she afterwards receive by inheritance, gift or otherwise, any

property, except from the use, appropriation and conversion of the real and personal property of said estate.

6th. That she commenced a series of fraudulent actions whereby she eventually absorbed the whole estate. That she sold a large number of negro slaves and received payment therefor, and collected large sums of money due and owing to said estate, and appropriated the moneys thus received to the purchase of real and personal property in her own name, and to other uses and purposes personal to herself.

7th. That she procured a power of attorney to mortgage the real property to pay an alleged debt, when at that very time she held mortgages belonging to the estate amounting to $8,000 or $10,000, and could have paid the debt without encumbering any of the lands.

8th. That instead of foreclosing the Peter Sken Smith mortgage of $6,300 due the estate, she bought in the property covered by it at a tax sale thereof, taking the title to herself individually.

9th. That during the twelve years of her administration of said estate, she absorbed these valuable lands, besides more than $25,000 of personal property, and $2,000 of borrowed money, while the indebtedness in 1851, as she claimed in her petition for the sale of

the real estate for payment of debts, was greater than when she took charge of said estate, and was chiefly owing to herself.

10th. That on the 7th day of July, 1851, she petitioned the County Court for an order to sell the real estate of her testator for the purpose of paying her alleged advances claimed to be due herself, amounting to $4,853.80, and the $2,000 borrowed from Mrs. Peck. That she obtained an order for such sale, and on the 15th day of July, 1851, she sold the Markland cottage place and a lot on St. George street to William A. Forward for $1,640. That the same land was deeded back to her in her own name and right by Forward shortly after for the sum of $1,660. That the property thus sold was worth at the time of said sale largely more than the amount paid for same.

11th. That during the period of her administration while the estate was rapidly wasting away, said executrix was purchasing valuable real estate in her own name ; and that, while she had no property of her own when her husband died, and acquired none afterwards, yet in 1851, when she applied for the sale of this real estate, she reports the estate indebted to her in the sum of nearly $5,000, and pretends to have $1,660 to pay Forward with for the purchase of the real estate.

12th. That Forward was a lawyer and her intimate friend and counselor, and that the transactions were contrived to defeat the elder Anderson's will.

13th. That she held and used said property as her own until her death, and sold at various times divers pieces of property, and died. possessed of the Markland cottage place and other properties of the estate, all of which she left by will to her son, the defendant, Andrew Anderson, Jr.

The effect of all these allegations is, that the said Clarissa C. has mismanaged, wasted and appropriated to herself individually all the estate of which she was the executrix ; and that she received personal property of the said estate largely in excess of what was necessary to liquidate all the debts without resort to any of the realty; and that therefore the sale of the realty was unnecessary. This, coupled with the allegation that she had no property of her own at her husband's death, and acquired none from any source afterwards except from his estate, and with the further allegation that while the estate was wasting away, she was purchasing valuable real estate in her own name and right, seems to us to be tantamount to a direct allegation that she misappropriated the assets of the estate to the purchase of property in her own name and right. The effect of these allegations, coupled with the charge that William A. Forward was her intimate friend and counselor, and purchased the real estate at her sale for $1,640 and shortly after re-conveyed to her in her own individual right for an express consideration of $1,660, and that the transaction was contrived to defeat the elder Anderson's will, we think amounts

to a direct charge that the sale by her under the order of the County Court was not only unnecessary, but contrived for the fraudulent purpose of converting the title to herself individually, and to defeat and defraud the complainants of their right therein as remainder-men under the will. The allegation that she had no property of her own to commence with, and acquired none afterwards except from the estate, coupled with the charge that when she applied for the sale of the realty, the estate was more deeply involved in debt than when she started her administration thereof, and that the debts, to pay which she desired the sale of the realty, were chiefly due to herself, savors very much to us, however ironically it may be expressed in the bill, of a direct charge that the debt claimed to be due to herself, and for the payment of which the lands were chieflly sold, was a fraudulent sham and pretense contrived for the occasion. We do not think there was any error in overruling this demurrer in the answer, which was the effect of the decree made. The effect of all these allegations is, that the personal effects that went into the executrix's hands were largely more than enough to pay all debts, and that the sale of the lands was unnecessary; and that the executrix mismanaged the estate and appropriated its properties to her own individual uses, and diverted the titles to its realty to herself individually, and with assets of the estate acquired titles to herself individually not only

to the realty of the estate, but to other real estate besides. We think the allegations of the bill make a case of fraud sufficient to be fully answered, and if sustained by the proofs sufficient to warrant relief. Story's Equity Pleading, (9th ed.), section 252.

The next alleged error that we will consider is the contention of the appellant, that because the evidence in the cause developed the fact that Henry P. Northrop and Thomas Ryan, as executors of Claudian B. Northrop, Sr., deceased, had no interest in the subject-matter of the suit, the decree was erroneously made with their names retained as parties complainant. A sufficient answer to this objection, we think, is, that it was established by the proofs that Claudian B. Northrop, Sr., deceased, was by the deed of antenuptial settlement of Emily Constance Anderson, who married George W. Taylor, made sole trustee of the interest of the said Emily Constance as an heir-at-law and devisee of the elder Andrew Anderson, in and to the properties involved in this suit, and was such trustee at the time of his decease without any consumation of the trust. One of the uses to which such interest was dedicated in his hands as such trustee being, "that he should hold the same upon trust to and for the legal representatives and distributees of the estate of the said Emily Constance such as there shall have been at the time of her death." Claudian B. Northrop, Sr., trustee, having died leaving a will,

his executors, the complainants, Henry P. Northrop and Thomas Ryan, became clothed with the duty, at least, of protecting and preserving the properties conveyed to their testator as trustee by such deed of marriage settlement, and are not improper parties, even if, by reason of the fact that all the beneficiary *cestui que trustents* under said deed of marriage settlement are also made parties complainant, it could be said that they were unnecessary parties. Story's Equity Pleading (10th ed.), sec. 510; *Ex parte* Knust, 1 Bailey, (Eq.), 489; 1 Perry on Trusts, secs. 343, 344; Maudlin, Montague & Co. vs. Armistead, Executor, 14 Ala., 702; Powell vs. Knox, 16 Ala., 346; Bloxham, Governor vs. Executors of Hooker, 19 Fla., 163.

It is contended for the appellant that the relief sought herein is barred by the express provisions of our statute of limitations; and in urging this point it is insisted that the object of the suit is to have certain sales declared void, and deeds cancelled on the ground of fraud, and that our statute expressly bars relief in actions predicated upon fraud. While it is true that the bill does allege divers fraudulent acts of the executrix, Clarissa C., in the disposition by her of the real and personal estate of her testator, and seeks to have such fraudulent disposition of the realty annulled, yet these averments and the specific relief prayed thereon are only incidents to the main purpose and object of the bill, which is for an accounting generally by the executor of the executrix, Clarissa C., for the proper-

ties of all kinds that went into her hands or under her control as executrix, that belonged to her testator, the elder Andrew Anderson.   The bill is by the heirs of the deceased, Andrew Anderson, seeking an investigation by the court of all the actings and doings of Clarissa C. Anderson, as executrix of his estate, and for an accounting therefor, and for restitution thereof. Viewed from this standpoint, the relief sought as to the realty can not accurately be said to be predicated upon the ground of fraud only.   Clarissa C. Anderson, in her capacity as executrix of the will of the elder Anderson, stood towards his property and those ultimately entitled thereto in the relation of trustee of a *direct* trust.   This suit, looking at its main features, being one by *cestui que trustents* against the trustee for an accounting generally for the trust properties, is, by our statute expressly exempted from any of its bars.   McClellan's Digest, section 20, p. 734; Revised Statutes of Florida, sec. 1283; Amos, Administrator, vs. Campbell, 9 Fla., 187; Bloxham, Governor vs. Executors of Hooker, *supra*; Joyce vs. Gunnels, 2 Rich. (Eq.), 259.   This being true, the bar of the statute does not operate upon a suit brought against her by the *cestui que trust* to rectify any improper and illegal disposition by her as such trustee of the trust properties, whether such disposition thereof is tainted with fraud or not.   Because fraud is alleged as the means by which the trustee has diverted the property from its proper and legitimate end, does not render the suit

any the less one by *cestui que trustents* against the trustee of an express trust for an accounting, and for restitution of the subject-matter of the trust, and therefore within the exception to which no express bar of the statute applied. The bill also presents the complainants in the character of remaindermen instituting their action for recovery of the reversionary property within one year after the death of a life tenant; this life tenant being also the executrix or trustee, and, as we shall see further on, the statute does not begin to run, as against such reversioners, until the termination of the life estate.

It is contended further for the appellant that the cause of action to annul the disposition of the realty made by the executrix, accrued to the complainants in July, 1851, when the sales were made by her, and that they are barred by time, and estopped by laches in not instituting suit earlier. By the will of Andrew Anderson, Sr., all of his property, real and personal, was bequeathed and devised to his wife, Clarissa C., the executrix of his will, for and during her natural life, with remainder over in fee to all of his children, share and share alike. It is alleged in the bill, and not denied, but admitted by the answer, that the said Clarissa C. held continued possession of much of the most valuable part of the realty of her testator's estate from the date of his death until her own decease. Under these circumstances, was it incumbent upon the remaindermen during her life-time to look into the char

acter of the title, from time to time, by which she re-
tained that possession of the reversions in which she
was left by the testate ancestor at the time of his
death, and the right to which, for her life, was created
by the will of which she was sole executrix ? And
were they obliged to resort to the courts, pending her
life, to cancel and remove fraudulent or other
wrongful clouds thrown over the title by her, she,
by the will, having the right to possess and en-
joy it both as executrix and as life tenant, un-
less such cloud or title intended to be set up ad-
versely to that of the remaindermen had been brought
to their knowledge by *direct* and unmistakable notice?
Especially when the acts that culminated in such
wrongful cloud were done by her during her adminis-
tration of the property as executrix or trustee thereof?
And does the statute of limitations run against them
until the falling in of the life estate ? It is undoubt-
edly true that remaindermen, having a vested remain-
der in fee, have the right, pending the continuance of
the life estate, to resort to the courts by bill to remove
clouds from and otherwise to protect and preserve
their reversions. Aiken vs. Suttle, 4 Lea, 103 ; 1
Story's Equity Jurisprudence, sec. 704. We have
carefully reviewed the authorities cited by the appel-
lant to this point, and many others, but we fail to find
any case sustaining the view that the statute will be-
gin to run against them, or that *laches* will be imputed
to them, unless they have *actual notice of adverse
rights*, before the termination of the life estate, ex-

cept it be in the case of Woodstock Iron Co. vs. Ful-
lenwider, 87 Ala., 584 (13 Am. St. Rep., 73) in which
the facts, in brief, were, that the widow of one Hudson
owned a life estate in the lands in controversy based
on her allotted right of dower therein. The adminis-
trator of the estate, who was a person other than the
dowered widow of the deceased, sold the reversionary
estate by order of the Probate Court for the payment
of debts of the estate, and the widow purchased such
reversionary estate at such sale, thereby becoming
vested with the entire title in fee. She immediately
after the purchase at the administrator's sale, con-
veyed the property to the defendants by deed absolute,
and put them in possession. She at the administra-
tor's sale paid the purchase money, that was devoted
by the administrator to the payment of debts of the
estate. The defendants remained in continuous, open,
exclusive possession of the premises under this claim
of right for more than twenty years. Within less
than ten years after the death of the widow, the heirs
of her deceased husband brought ejectment against
the defendants (her vendees) to recover the lands be-
cause of alleged irregularities and illegalities in the
proceedings in the Probate Court that culminated in
the sale to the widow. The case is silent as to whether
the plaintiff heirs had any notice or not of the Probate
Court proceedings or sale thereunder, but it does not
show that the possession of the defendants was open
and adverse. The court there held that the plaintiffs

had the right to sue in equity to remove the cloud on the title under the irregular administrator's sale; and that their failure to exercise this right for more than twenty years was such laches as authorized the inference that the right to do so was barred in any of the modes in which that result may be effected. This decision, though silent on the question of notice to the plaintiffs of the Probate Court proceedings, and of the purchase and possession *by others* than the life tenant, treats the question as though the plaintiffs were affected by notice of their rights in the premises, but knowingly slept over them for more then twenty years, during which time there was open and adverse possession in another. This decision, in view of the adverse possession of the premises by persons other than the life tenant under a claim of right based upon such illegal and void sale, we think is right in principle. But it differs from the case under consideration widely, in this, that in this case the life tenant, who is also executrix, remains and dies in possession of the reversionary property, or a large portion thereof, and her heir sets up in her an adverse title acquired through her own sale thereof while acting as executrix; of which sale, and of which adverse claim the complainants are not shown to have had notice or knowledge until after her death; and fraud is alleged in the acquirement by her of the adverse title that is set up. By a decided weight of the authorities, amply supported by soundest reason, as we think, re-

maindermen are not obliged to resort to this remedy, where the reverting property remains in the possession of the trustee and life tenant with whom it was left by the same instrument creating their reversionary rights, until after the termination of the life estate, unless at least there be clear proof of *actual* knowledge brought home to them of the abandonment by the life tenant of her claims as such, and the setting up by her of title hostile to that of the reversioners; and the statute of limitations will not begin to run against remaindermen in the absence of such knowledge until after the termination of the life estate. Kemp vs. Westbrook, 1 Vesey, Sr., 279; McCreary vs. Burns, 17 So. Ca., 45; Kellar vs. Stanley, 86 Ky., 240; Luntz vs. Greve, 102 Ind., 173; Jackson vs. Schoonmaker, 4 Johnson, 390; Wells vs. Prince, 9 Mass., 507; Angell on Limitations, 377; Beattie vs. Wilkinson, 36 Fed. Rep., 646; Evans vs. Benyon, L. R., 37 Ch. Div., 329; Orthwine vs. Thomas, 127 Ill., 554; Hope vs. Norfolk & Western Ry., 79 Va., 283; Pettyjohn's Executor vs. Woodruf's Executor, 77 Va., 507; Allen vs. DeGroodt, 98 Mo., 159, (14 Am. St. Rep., 626); Lindley vs. Groff, 37 Minn., 338; Wallingford vs. Hearl, 15 Mass., 471; Fleming vs. Burnham, 100 N. Y., 1; Smith vs. Patterson, 95 Mo., 525; Jones vs. Freed, 42 Ark., 357; Jackson vs. Johnson, 5 Cowen, 74; Ball vs. Johnson's Executors, 8 Grattan, 281. It seems to be well settled, and we cannot conceive how it can be otherwise, that the possession of the life tenant can not, from the very nature of things, ever be adverse

to the rights of the remaindermen. So long as the life tenant lives, no lapse of time can ripen a *possessory* title in the life tenant as against the reversioners. See authorities *supra*, and 1 Washburne on Real Properiy, 97, and authorities there cited. The life tenant under the will here died in 1881, in possession of much of the realty, and that possession is shown to have been continuous from the death of her husband and testator, the elder Anderson, up to the day of her death. This suit was instituted by the reversioners in 1882, within one year after her death. There is, therefore, no bar by any express provision of the statute, no matter from what standpoint we view the case; whether we treat Clarissa C. Anderson as tenant for life holding the property in her capacity as such under the terms of her testator's will, or whether we treat her as an undischarged executrix and trustee holding the properties of the estate in her capacity as such up to the date of her death. The conclusion that we have reached from the evidence is, that she was never discharged or relieved from her position, duties and responsibilities as executrix or trustee of the estate of the elder Anderson ; but continued to be such executrix, clothed with all the duties, responsibilities and trusts imposed upon her by that position, so far as these complainants are concerned, up to the day of her decease. And it is upon this ground that we base our conclusion that the complainants as remaindermen or devisees under the will of the elder

Anderson are not barred by any statute of limitation from seeking, as they do, an accounting from her, at the hands of her executor, for the properties devised to them by the will of which she was the executrix at the time of her decease. The appellant contends, and the allegation is made in his answer, that this executrix was discharged, but the only proof of the fact is the filing in evidence of a notice made by her that she would apply for final discharge, in the following words: "Notice is hereby given that in *two* months from the date hereof, I will file my final accounts in the office of the Honorable Judge of Probate of St. Johns county, for settlement, allowance and final discharge." Appended to this notice is proof by affidavit of one E. B. Gould, made before G. Humphreys, Judge of Probate, to the effect that said notice was, on the 20th of March, 1852, posted at the post office, and at the Judge of Probate's office. The law as it existed then, and as it stands to-day, authorizes the discharge of an executor or administrator only after notice of the intended application for discharge has been published for *six* months in one newspaper, at least, nearest the place where letters were granted. Act of February 15th, 1834; McClellan's Digest, page 211; sec. 1876 Rev. Stat. Fla. This court, construing this statute, in Gadsden vs. Jones, Admr., 1 Fla., 373, said: " Before the court can hear the application of an executor or administrator under the provisions of this act, before it can even take jurisdiction of the

case at all, *six months' notice* of such intended application must be given in one or more of the gazettes nearest the place where the letters were granted." The notice introduced here to establish, as we suppose, a *presumption* of discharge is for *two* months only, and even then was made public only by posting, a mode of publication that, in such cases, at no time seems to have been contemplated by our statute. Had a final discharge been granted upon such a notice, it would have been a fraud upon the law, and would have been worthless and void. The notice introduced here to establish the fact of discharge, then, proves nothing, and does not give rise even to a *presumption* that there might have been a discharge. And there is no proof that she ever made any final accounting as executrix. Never having been discharged as executrix, she occupied the relation, at the time of her decease, of trustee towards the complainants, and towards all properties of the estate that had not been properly disposed of, and the defendant, Andrew Anderson, Jr., having been made executor of her will, and duly qualified as such, became clothed at once with the character of trustee over the properties that she held as trustee, and as such substituted trustee, is amenable to an accounting therefor, to the extent hereinafter indicated. to the *cestui que trustents* in a court of equity. This court said in Governor for use of, etc., vs. Executors of Hooker, 19 Fla., 163: "He will not be allowed to accept the trusts created by his immediate testator, and to repudiate those with which his testator was charged." Because of this conclusion

that we have reached, that Clarissa C. Anderson was never relieved or discharged from her position as executrix and trustee of this estate, and that the suit is properly one by *cestui que trustents* seeking a general accounting from the trustee for the properties subject to the trust, it becomes evident that there is no foundation for the contention of the appellant that the complainant's remedy was at law by ejectment, and not in a court of equity.

It is further contended for the appellant that the complainants are barred of any remedy in equity, apart from the express bar of the statute by laches. In considering this question, the dual character of the appellant's testatrix, Clarissa C. Anderson, 1st, as executrix or trustee of the estate of her deceased husband, and, 2d, the position of life tenant that she had the right to hold under her testator's will, and that she might have held towards all of his property not properly consumed in the payment of his legal liabilities, had she been properly relieved of her liabilities and responsibilities as executrix, must be borne in mind in connection with the nature of the relief sought by the bill; and the dual attitude of the complainants: 1st, as devisees under the will generally, seeking an accounting from the executrix of the properties entrusted into her hands as such, and 2nd, the character given to them by the will as reversioners entitling them to the *corpus* of the property devised only at the termination of the natural life of she that was executrix. And we enter the discussion of this

feature of the case with the enunciation of some general principles of law that are settled beyond controversy, and that are applicable to a proper decision of the question under consideration : 1st.   That laches is a neglect to do something that, by law, a man is obliged or in duty bound to do.   Sibag vs. Abitol, 4 Maule & Selwyn, 462 ; Wilmot vs. Barber, L. R. 15 Ch. Div., 96 ; Weldon vs. Dicks, L. R. 10 Ch. Div., 247 ; Murray vs. Palmer, 2 Sch. & Lef., 474.   2nd. That the application by the courts of the doctrine of laches depends upon the circumstances of each case. Bryan vs. Kahs, 134 U. S., 126 ; Bowden vs. Layland, L. R. 26 Ch. Div., 783 ; Platt vs. Platt, 58 N. Y., 646 ; James vs. Throckmorton, 57 Cal., 368 ; 1 Perry on Trusts, sec. 230.   3rd.   That no laches can be imputed to reversioners in a contest between them and the tenant for life over the reversionary property until after the termination of the life estate, unless it be shown clearly and unequivocally that before that time they had *actual* knowledge of an abandonment by the life tenant of her status as such, and of a holding of the property by her under a different and adverse right.   And that the *onus* of showing such notice or knowledge, as, when coupled with long acquiescence, would amount to laches, is on the party urging laches as a defense.   Life Association vs. Siddal, *supra;* Cooper vs. Green, 3 DeG., F. & J., 57 ; Haynie vs. Hall's Executor, 5 Humphreys, 290 ; s. c. 42 Am. Dec., 427 ; Larzelers vs. Starkweather, 38 Mich., 96 ;

Lux vs. Haggin, 69 Cal. ,255 ; Massie's Administrators vs. Heiskell's Trustee, 80 Va., 789 ; 2 Perry on Trusts, sec. 850 ; McCarthy vs. McCarthy, 74 Ala., 546 ; Randall vs. Errington, 10 Ves. Jr., 423 ; Duke of Leeds vs. Earl of Amherst, 2 Phillips (22 Eng. Chy.), 117. And it is for the party urging laches to show *when* his adversary acquired a knowledge of the truth, and to prove that he *knowingly* forebore to assert his right. Lindsay Petroleum Co. vs. Hurd, L. R. 5 App. Cas., 221 ; Bennett vs. Colley, 2 Mylne & Keen (7 Eng. Chy.), 225 ; Paschall vs. Hinderer, 28 Ohio St., 568 ; Roach vs. Caraffa, 85 Cal., 436 ; Orthwine vs. Thomas, 127 Ill., 554 ; Pomfret vs. Windsor, 2 Ves. Sr., 472 ; March vs. Russell, 3 Mylne & Craig, (14 Eng. Chy.), 32 ; Bausman vs. Kelley, 38 Minn., 197 ; Shannon vs. White, 6 Rich. (Eq.), 96 ; McClure vs. Ashby, 7 Rich. (Eq.), 430. 4th. That in cases of continuing trusts, that are strictly such and recognized and enforced in courts of equity only so long as the relation of trustee and *cestui que trust* continues to exist, no length of time will bar the *cestui que trust* of his rights in the subject of the trust as against the trustee, unless circumstances exist to raise a presumption from lapse of time of an extinguishment of the trust, or unless there has been an open denial or repudiation of the trust *brought home to the knowledge* of the *cestui que trust* which would require him to act as upon an asserted adverse title. Robinson vs. Hook, 4 Mason, 139 : Baker vs. Whiting, 3 Sumner, (U. S. C. C.), 475 ;

Boone vs. Chiles, 10 Pet., 223 ; Kuton's Heirs vs. Kuton's Administrators, 20 Mo., 530; Kane vs. Bloodgood, 7 Johnson's Chy., 89.

With this statement of the principles that govern in this case, we will now apply them to the pertinent facts and circumstances that have been established, as we think, in the proofs, for the purpose of ascertaining whether, and to what extent, the complainants, considered either as ordinary devisees, or as remaindermen under the limitations of their ancestor's will, are to be charged with laches in their effort to recover the devised properties that they find in kind in the hands of the person at her decease who was trustee of such property, and who had the rights also, by the will of her testator, of a life tenant in such property.

It is admitted that the elder Andrew Anderson died leaving a will ; that it was duly probated ; and that the defendant's testatrix, Clarissa C. Anderson, was named in and qualified and acted as the sole executrix thereof. That she, under said will, took charge, control and possession of all the real and personal properties of said estate. That she died in 1881, and at that time still retained in her possession a considerable portion of the real estate of her testator, and some little of the personalty in kind, besides some real estate that, it is clearly established, she acquired title to by means of obligations enuring from others to the estate. The proofs, we think, establish clearly the further facts that all the complainants and all of those in whose right they claim by inheritance were contin-

uously non-residents of this State from the time of
the  death  of  the  elder  Anderson  up  to  the  filing  of
their bill herein, at great distances from the *locus* of
the  properties  and  the  scene  of  the  administration,
with no evidence of any direct communication between
them and the executrix by  correspondence  or  other-
wise, except for a short while during the first years of
the administration.   That the  said  Clarissa  C., as ex-
ecutrix, in 1851, obtained an  order  from  the  Probate
Court of St. Johns county for the sale of, and, under
it, did sell all of the real  estate then  standing  in  the
name of Andrew Anderson, Sr., for the alleged pay-
ment of a debt of $2,000, contracted after her testator's
death  by  her  as executrix, with the sanction of some
of those through whom complainants claim, and a
claim of upwards of $4,000 which she, as executrix,
brought against the estate for  "advancements," and
for  the  expenses  of  her  administration.   That the
terms of that sale, as advertised, were to be for cash.
That at that sale William A. Forward, a personal
friend of the executor, bid off all the property sold
*in one single lump*, although it consisted of separate
detached lots, for the sum of $1,640 ; that he did not
comply with the advertised terms of the sale by pay-
ing cash therefor, but gave to the said executrix, not
as executrix, but in her own individual name and
right, his note for the amount of his bid at said sale,
payable twenty days after its date, July 15th, 1851, se-
cured by a mortgage to her individually on the same
property purchased at the sale ; and that on the same
day, July 15th, 1851, she, as executrix, conveyed all of

said property to him by deed in fee; the mortgage containing a clause expressly permitting her to retain possession of all the mortgaged property. That on the 30th of August, 1851, Forward conveyed the entire property to Clarissa C. Anderson, in her own name and right, by deed in fee, in consideration, as expressed in said deed, of $1,660; and on the same date the said Clarissa C. executed to him a cancellation of his mortgage. We think the proof further establishes the fact that the said Clarissa C. continuously retained possession of all of said real estate, except such parts thereof as she afterwards sold and conveyed to others, from the death of her husband until her own decease, without any break in her possession. Under this sale by order of the Probate Court she claimed, and the defendant, as her sole devisee, claims that the rights of the complainants as reversioners were divested, and that the title of the said Clarissa C. became absolute thereto. In considering the question as to whether these *cestui que trustents* and reversioners are in laches in their present assault upon this transaction, we have to look to the evidence to see whether that *actual knowledge* of these Probate Court proceedings and the sale thereunder to Forward, and by him back to the said life tenant in fee, was carried home to the complainants, and when it was so brought to their knowledge. The *onus*, as before seen, of showing this knowledge, and time of its acquirement, is on the defendant. The only evidence

we have from the defendant on this point is, that his mother, the said Clarissa C., told him that she had notified Claudian B. Northrop. We hardly think that this hearsay statement coming from the lips of the party charged with wrong doing can be seriously urged as an establishment of the fact that the complainants, or those through whom they claimed, were possessed of the requisite *actual* knowledge on this subject. The defendant contends, however, that the record of the deeds from the said Clarissa C. to Forward, and by Forward to her, was notice sufficient to them. We can not agree with this contention. The continued, unbroken *possession* of the trustee or executrix, who had the rights also of a life tenant, in the absence of *actual knowledge* to the contrary, was of itself an evidence upon which these remaindermen had a right to rely, that she held it thus continuously in right of her executorship or life tenancy as created by her husband's will; and, so long as she continued in its possession the remaindermen had no cause to look or enquire into the tenure by which she held, and were not obliged to look to the records, at least in the absence of actual knowledge of an *adverse* holding by her under another title hostile to that created by the will of her husband under which she first acquired that possession. Leach vs. Ausbacher, 55 Pa. St., 85; Varney vs. Stevens, 22 Maine, 331; McCarthy vs. McCarthy, 74 Ala., 546; Bowden vs. Layland, *supra*; Maul vs. Rider, 59 Penn. St., 167; McMahon vs. Mc-

Graw, 26 Wis., 615; Duffitt vs. Tuhan, 26 Kansas, 292. Even were we to regard the assertion of the defendant : "That his mother had told him she had notified Claudian B. Northrop," as competent evidence to establish the fact asserted, it could not avail in this case as notice to the complainants, since none of them claim through Claudian B. Northrop, but through his wife, Hannah Eliza; and in such case the knowledge or acquiescence of the husband could not bind the married woman, nor those who claim through her. Underwood vs. Stevens, 1 Nerivale, 712. If we view this feature of the case from the standpoint of the appellant, as being one for relief on the ground of fraud, our statute (McClellan's Digest, sec. 10, p. 733) itself fixes the time of the accrual of the cause of action at the date of the discovery by the aggrieved party of the *facts* constituting the fraud. The above authorities sustain the idea that there can be no constructive discovery. In Rolfe vs. Gregory, 4 De G., J. & S., 579, it is held : "As the remedy is given on the ground of fraud, it is governed by this important principle, that the right of the party defrauded is not affected by lapse of time, or, generally speaking, by anything done or omitted to be done, so long as he remains, without any fault of his own, in ignorance of the fraud that has been committed." The same rule in effect is reiterated in Bailey vs. Glover, 21 Wallace, 342, and in Traer vs. Clews, 115 U. S., 528. The *possession* by the executrix or life tenant, Clarissa C. Anderson, of the reversionary property being entirely consistent with

and permitted by the title by which the reversioners could claim only at her death was, of itself, calculated to deter them from enquiring for any other title not consistent therewith, and furnishes a natural and, as we think, sufficient excuse for their failure to examine the records. And in this connection it may be said that the continued absence from the State of all the complainants, and their consequent want of access to the records, and to the knowledge of the transactions that might have been general in the immediate community, is a circumstance that should weigh in favor of their want of knowledge on the subject. Holt vs. Wilson, 75 Ala., 58; Heirs of Ware vs. Brush, 1 McLean, 533. The fact, too, that in the deed of marriage settlement executed by Mary Anderson, one of the daughters of the elder Andrew Anderson, made in 1855, several years after this Probate Court sale, he rone-fourth interest in this reversionary property is expressly conveyed to the trustees named in said instrument, along with other property, is a strong circumstance in favor of her want of knowledge at that time of the divestiture of her rights as a reversioner by means of these Probate Court proceedings.

The bill and the developments from the proofs present the case to our minds as being one where reversioners, entitled to the *corpus* of the estate only at the termination of the life of one who has the rights of a life tenant, and who is also executrix and trustee of the property, quietly, and without fault of their own, waiting for the time to arrive when they can claim that property as their own; during all of which period of

waiting they see the person in the enjoyment of its actual possession whom they know has the right to enjoy it *pro tem.* by the same instrument that gives them their rights when her life is ended.    When the *legal* period of their waiting is over they *promptly* move to claim their patrimony, and are met at the threshold with the assertion that in the long past she who was *trustee*, and whom these reversioners had just right to believe was life tenant, had purchased the property, and during all these years of their silent and trustful waiting, had been holding and enjoying it, not as trustee, not as life tenant, but *adversely, en autre droit.* Under these circumstances we think that the complainants were not under any obligation or duty to make search or enquiry for any other title by which such trustee and life tenant held the possession of these properties than the one under which she first entered into its possession; and we do not think that laches can be imputed to them under the circumstances for failing to make such enquiry, or for their failure to resort to the courts sooner than they did, viz: within a year after her death.    As we have before seen, there is no proof that this executrix was ever discharged or relieved of her duties and responsibilities towards this estate as direct and continuing trustee thereof; and there is no proof that the attempted change by her of her attitude towards the property from that either of trustee or life tenant to that of absolute and adverse owner was ever brought home directly or indirectly to the *actual* knowledge of the complaining *cestui que trustents.*    Neither are there any circumstances in the

pleadings or proofs that give rise to a presumption, from lapse of time, of a repudiation by her of her trust or of her rights as life tenant, such as would have put the complainants upon notice of the setting up of an adverse title.   Our conclusion is, therefore, that the complainants are not barred either by any express provision of the statute of limitation, or by lapse of time through any apparent or unexcused laches.

The appellant contends further that the complainants' bill is defective because it fails to affirmatively disclaim that the complainants' *ancestors* were also without knowledge of the mismanagement and appropriation of the estate alleged to have been made by the executrix. and of the Probate Court proceedings by which the title to the lands of the estate were devoluted into the individual name of the executrix. There is a well-established rule affecting more directly the pleadings in a court of equity to the effect that where a bill upon the face of its allegations shows long *acquiescence* and *laches* by the complainants in the assertion of their claims, then it becomes necessary for them, by way of excuse for such *apparent acquiescence* and laches, to *allege* and prove some actual hindrance or impediment to the seeking of their rights, such as concealment of, or faultless want of knowledge of facts, and if they fail to allege or prove such excuse or reason for the long delay, laches will be imputed to them, and the courts will refuse their aid by reason thereof.   Badger vs. Badger, 2 Wall., 87.   And if the bill shows such laches on its face with-

out any allegations excusing it, the defect can be
taken advantage of by demurrer.    Bercy vs. Lavretta,
63 Ala., 374 ; Maxwell vs. Kenedy, 8 How., 210.    But
we do not think this bill, or the case made thereby,.
falls within this rule.    Taken as a whole, it does not
show a case of long acquiescence, or its consequent
laches, but on the contrary, it carries on its face a just
and natural excuse for the delay in the application to
the courts for the relief now asked—in the fact that
the complainants all along saw the person in posses-
sion of the properties, who, by their grandfather's
will, was entitled to that possession both as executrix
and as life tenant.    Suppose they had applied earlier
for the relief now sought, what would have been the
result of the litigation ?  Clearly, under the limitations
of the elder Anderson's will, no litigation over his es-
tate instituted prior to the death of Clarissa C. could.
have resulted in dispossessing her of any of the prop-
erties, real or personal, nor could it have resulted in
an immediate enjoyment of any such property by the
complainants until after the termination of her natur-
al life.    So that the bill, upon its face, does not pre-
sent a case where it was necessary for the complain-
ants to excuse self-evident laches by allegations of
ignorance of facts.    And when the proofs came in it
further appeared, as we have seen, that the defend-
ant's testatrix was never divested of her character as
trustee and executrix ; and that she has never, as.
such, rendered any full and final accounting for the
properties that went into her hands as such.    And.

that we have to deal with her acts as trustee in reference to the properties of the estate.

Having found that the executrix, Clarissa C., was never discharged or relieved in any way of her position of trust as executrix, and that she has never rendered any final or full accounting of her trusteeship, and that she was still such trustee at the time of her death, we will now, in connection with the subject of laches, enquire how far and to what extent it would be proper, under all the circumstances of this case, to require an accounting from the executor of the executrix for the properties that went into the hands of the latter as such. That she, as executrix, was required to make annual accountings of her administration, and, within a reasonable time, a full, minute and final accounting thereof, are matters of law which the complainants were bound to take notice, and their ignorance thereof furnishes no excuse for their delay in demanding such an accounting if they saw proper to have, or desired one. Campan vs. Godfrey, 18 Mich., 27; Adams vs. Guerard, 29 Ga., 651; Brist vs. Yeaton, 101, Ill, 242. Before moving for such an accounting the complainants have waited for more than forty years since the executrix, as such, took charge of the estate; and until after her lips are forever closed to all explanation, in death, and until all witnesses conversant with her actings as executrix are dead, and until the archives of the office where the record evidence of her acts should have been kept, have passed through the recklessly destructive

mill of a civil war—the office itself, the proofs show, having been used as quarters for soldiery. All the evidence that we have left upon the subject of her administration, and all that, it appears to us, is now procurable are a copy of appraisment or inventory of the personal property and her annual accounts filed in the years 1841, 1842, 1846, 1847 and 1848, but none of them appear to have been passed upon or approved by the Probate Court, except the one filed in 1847. There is nothing to show what the actual indebtedness of her testator was; indeed, no evidences of indebtedness appear, except the record of a decree of foreclosure of a mortgage on the negroes of the estate for $5,800, rendered on the 14th of November, 1840, in favor of one McRae, against her as executrix. Other items of indebtedness are represented in her extant accounts to have been paid by her, but the evidence of the claims themselves, or the vouchers received by her on their payment, are absent. Under these circumstances it would be requiring the impossible to oblige this defendant, as executor of the executrix, to go at this time into a strict, minute and accurate accounting for all the items of personal property that went into his mother's hands as executrix of the elder Anderson. And our conclusion is, that under the rules governing courts of equity, the delay of the complainants in asking for such an accounting must be visited upon them to the extent that no strict or minute accounting for the personalty of the estate will now be accorded ex-

c;pt where it is found *in kind* in the hands of the executrix at her death, with no proof from which a presumption could arise that it was ever properly administered upon by her. Neither do we think that it would be proper at this time, under all the circumstances, to make any item or items in the annual accounts of this executrix that now survive her the basis of a monetary charge either in favor of or against her estate. Many items therein stated as credits to herself are clearly wrong and illegal upon their face, but after the death of all the parties and the obliterations of evidence consequent upon the great lapse of time, it would be inequitable to single out these items, because their amounts may have been properly applied elsewhere. As to the personalty of the estate that has been disposed of by her it would keep the conscience of equity clearer to leave the disposition of it made by her in the same state of oblivious repose, uncertainty and doubt that the unsatisfactory proofs herein found them in at the date of her death. Morrison's Executor vs. Householder's Administrator, 79 Va., 627; Barnwell vs. Barnwell, 2 Hill's Chy. (So. Ca.), 228; Raynor vs. Pearsall, 3 Johnson's Chy., 578; West, Administrator, vs. Thornton, 7 Gratt., 177; Weatherford vs. Tate, Executor. 2 Strobh. Eq., 27; 12 Am. & Eng. Ency. of Law, 539, and authorities cited.

In Lafferty vs. Turley, 3 Sneed (Tenn.), 157, a case analagous to the one under consideration, the administrator rendered no accounts whatever, not even filing an inventory of the estate. He administered in 1823,

and died in 1851. In 1852 a bill was filed against his executor by the heirs of his intestate for a full accounting of his administration of the former estate. The court held that under the circumstances the transactions were too much obscured by time, and the danger of injustice too great to enter into a strict and minute accounting, and that to this extent the laches of the complainants must be held to affect their claim ; but certain large sums that the administrator had collected, of which there was record evidence, and, that the evidence showed, had never been accounted for or administered in any way, his executor was required to account for.

We turn now to a consideration of the issue as to the validity of the proceedings had in the County or Probate Court of St. Johns county, by which the appellant claims that his testatrix acquired an adverse title to the realty of the estate of her testator that was found in her possession at her death. The appellees contend that said proceedings, and the title predicated thereon, are void, because upon their face it is shown that the Probate Court had no jurisdiction to order the sale thereof. That the jurisdictional fact —"that the personal estate had been *exhausted*"—is not shown by said proceedings to have appeared. The appellant, on the other hand, contends that the question of the Probate Court's *jurisdiction* to order such sale can not now be made to avail the complainants,

because they have not in their bill raised any such issue, or made any assault upon these proceedings upon that ground.

We agree with appellant's position, that whether the Probate Court had jurisdiction or not to order this sale, it can not avail the complainants because in their pleadings they have not presented any such issue. The rule is thus stated in Story's Equity Pleading (9th ed.), sec. 257: "Every fact essential to the plaintiff's title to maintain the bill, and obtain the relief, must be stated in the bill, otherwise the defect will be fatal. For no facts are properly in issue, unless charged in the bill; and of course no proofs can be generally offered of facts not in the bill; nor can relief be granted for matters not charged, although they may be apparent from other parts of the pleadings and evidence, for the court pronounces; its decree *secundum allegata et probata.*" Glascott vs. Lang, 2 Phillips (22 Eng. Chy.), 310; Hoyt vs. Hoyt, 27 N. J. (Eq.), 399; Eyre vs. Potter, 15 Howard, 42; Hart vs. Stribling, 21 Fla., 136; Branerd vs. Arnold, 27 Conn., 616. Reaching this conclusion, the question of the jurisdiction of the Probate Court to order this sale is eliminated from further consideration in the case.

We turn now to a discussion of the *necessity* for, and the *bona fides* of, this sale of the realty. And we announce it as a preliminary proposition that if there was sufficient personal property that went into 'the

hands of this executrix fully to pay all of the debts of the testator, then there was no *necessity* for the sale of the realty; and if the executrix, instead of applying the personal assets to the payment of debts, misapplied them to other purposes, and misappropriated them to her own uses, and afterwards procured the order for the sale of the realty for the payment of debts that should have been paid with the personalty, then, under such circumstances, such sale was, as between the executrix and devisees, a fraud in law upon the reversioners, no matter how regular upon their face the proceedings for such sale may appear, nor whether the court ordering it had jurisdiction or not, and she should not be allowed to derive any benefit therefrom, as purchaser of the trust properties sold.

Although we think it proper, as above shown, to close the door, after such great lapse of time, to a strict and minute accounting by the executrix of the elder Anderson, in her capacity as such, particularly so far as the personalty is concerned, yet we think it proper, under the peculiar circumstances of this case, to resort to the annual returns made by her that are still extant, as evidence, for any light that they might throw upon the subject now under consideration— the necessity for, and *bona fides* of, this sale of the realty.

Referring to the appraisement list, still extant, of the personalty, we find that the aggregate total thereof, *excluding* three negroes and some railroad

and canal stock and nursery of mulberry trees, amounted to the sum of $33,551.66. This included debts due to the estate amounting in the aggregate, those considered good as well as those considered doubtful or bad, to $11,621.41. The defendant contends that these claims were uncollectable owing to the financial depression of the times, though her returns show that the executrix did collect a considerable percentage thereof; yet we can give the defendant the benefit of more than this contention, and treat all the debts due the estate as bad by deducting their gross sum from the appraisement, and it leaves a balance of $21,930.25 of personalty as per appraisement. No comfort can flow to the defendant out of the supposition that the values fixed to the different items in this appraisal were too high, because the extant returns show that wherever sales were made by the executrix of the personalty, the items brought the full sum at which they were appraised, and in many instances considerably more. The defendant in his answer also contends that this balance includes $6,300 of worthless stock in the Southern Life Insurance and Trust Company. Giving him the full benefit of this contention, by deducting the latter sum also, and there is a balance left of $15,630.25, that can fairly be assumed, went into the hands of the executrix with which the debts should have been paid. Indeed it is shown from her returns still extant, that up to May

6th, 1843, she had actually received from sales of the personalty and collections the sum of $13,866.06, and at that date she still had fifteen negroes on hand and undisposed of, that were appraised at $6,350. What the debts of the deceased actually amounted to is nowhere very definitely shown, but from the returns of the executrix in proof we can find only the sum of $7,-938.18 of anything resembling legitimate debts due by him at the time of his death. The bill alleges that the debts amounted to less than $5,000 at the time of the elder Anderson's death, but the answer denies this and asserts that they amounted to more than twice that amount. Let us admit this contention of the answer, and even go further and say that they amounted to three times that amount, or $15,000 (though this is a violent presumption, with the lights before us), even then by the defendant's own showing the executrix had more than enough personal assets to pay them all in full without resort to any of the realty, and without any necessity for the loan of $2,000 affected from Mrs. Peck by the mortgage of the realty. Instead of paying the debts, however, with these assets, we have the affirmative evidence from her returns that she diverted the large sum of $7,204 towards improving the Markland cottage property. That, of itself, was almost enough to liquidate all the legitimate debts left by her testator, so far as any exhibit of them is made in her extant returns, or even suggested by

anything in the record. In her application for the sale of the realty, she represents the debts, for which a sale thereof was necessary, to consist of $4,853.80, alleged to be due to herself for "advancements," and $2,000 due to Mrs. Peck for the money borrowed on mortgage, making a total of $6,833.80. The money expended in building upon and improving Markland cottage was considerably more than enough to pay this amount, had it been properly applied. And again the sale of the realty was applied for mainly for the purpose of paying the aforesaid sum of $4,853.80, alleged to be due to the executrix for advances claimed to have been made by her for the estate. It is alleged in the bill, and practically admitted by the answer, that at the time of the death of her testator she had no property of her own of any kind, and did not acquire any afterwards, save as executrix from the properties of the estate. This, it seems to us, completely negatives the correctness of her claim for *advancements* made. The terms of the sale, too, were advertised to be for *cash*, a circumstance that tended to keep off all bidders except the favored few who could command the cash—and yet we find a friend of the executrix buying in all of the property advertised, in one lumping bid, though the property consisted of detached parcels, and paying no cash therefor, but making his twenty days' note and mortgage *payable to the executrix in her own individual right*, serves the purposes of the cash for which the advertisement

called. And we find, too, that this note and mortgage never realizes any cash from the purchaser at the sale, but is taken up by the maker thereof by reconveying *all of the property* whose purchase money said note represented, within a few days after the sale, to the executrix in her own individual name and right; she, in the mean-time, by express terms of the mortgage itself, retaining the unbroken possession of all the property sold. How Mrs. Peck's debt of $2.000 was ever paid, and when, does not appear. There is no evidence that she ever resorted to the property by foreclosure or otherwise. The presumption is that she must have been paid, else she would have resorted to an enforcement of her lien. Then, as no money was in fact realized directly from this sale, she must have been paid by the executrix; and, as the executrix had no property except from the funds of the estate, the conclusion is irresistable that Mrs. Peck's mortgage was paid out of funds of the estate that were not realized from the sale of realty. As to the other part of the alleged debts for which the property was sold, claimed to be due to the executrix herself, there is much evidence in her extant return that it was made up largely of improper and illegal, and wholly unwarranted, credits to herself for her own personal supervision of the improvements put upon the Markland cottage place, and of other improper items for the hire of the slaves of the estate, for which she gave herself credit, and of illegal

charges, as credits to herself, for the work of the slaves of the estate in improving Markland cottage, and of charges for her commissions as executrix. Nowhere in any of her extant returns is there any charge for any moneys "*advanced*" by her for the estate. As she had no property of her own from which to make advancements, we must conclude that the claim for advancements was mythical.

Another fact stronlgy in support of the allegation of the bill that the executrix absorbed the estate and appropriated its properties to her own individual uses, and consequently that the sale of its lands was unnecessarily effected by her for the ostensible purpose of paying debts, is the transaction in reference to the Felicia Garvin lot that had been sold by her testator in his lifetime to the said Garvin for $2,500; $1,250 of this was paid prior to the testator's death, leaving a balance of $1,250 still due of the purchase price. After the testator's death the executrix instituted an action in the courts in her own individual name, to foreclose the vendor's lien—a debt due to her testator's estate. She obtained a decree, and the property being sold to satisfy the decree, she also took title to that piece of property in her own name individually, instead of to herself as executrix, with no accounting therefor. Still another fact showing a misappropriation of the properties of the estate, instead of paying its debts therewith, is the sale of a slave, "Cæsar," to one Papy for a lot of land in St. Augustine, the title

to which she took in her own name.   Still another fact
pointing in the same direction, in view of the admis-
sion that she had no property of her own, and sustain-
ing the charge in the bill, that while the estate was
rapidly wasting away, she was purchasing real estate
in her own name, is the purchase by her for $400 in
cash paid, and the conveyance to her individually on
the 28th of April, 1851, of a lot in St. Augustine, by
B. A. Putnam, as trustee of one Emily Southwick;
and this purchase, too, was made by her only a month
or two before she found it necessary to sell the remain-
ing lands of the estate for the payment of its debts.
Still another piece of proof that goes far towards sus-
taining the allegations of the bill as to the want of
necessity for the sale of this realty, and the improper
appropriation of its assets to the individual uses of the
executrix, is the transaction in reference to the lands
mortgaged to the executrix by Peter Sken Smith,
to secure the purchase price of the stock in the
Southern Life Insurance & Trust Company, bought
by him from the executrix.   Among the assets
of said estate were $6,300 of the stock of said
company that was sold by the executrix to said
Smith at its face value on time.   To secure the
payment of this sum, Smith gave to the executrix
his note, secured by mortgage on 1,000 acres of land
at St. Diego, besides lots 7, 14, 16, 23, 24, 25 and 26 in
North City, six lots in the Panjaud plantation, and
the lots known as the Whithurst and Crosby lots, all

in St. Johns county. She did nothing towards collecting or enforcing this mortgage, but, the property covered thereby being assessed and sold for taxes, she purchased the same at tax sale, and took the title thereto in her own name individually; and, under that tax title she has held the same ever since, with the exception of parcels thereof since then sold and conveyed by her to others at different times. The answer of the defendant claims that she was discharged in 1852, and that she made no returns or accountings after that time, yet we find from the proofs that she sold and conveyed portions of these Peter Sken Smith lands, purchased by her at tax sale, in the years 1869, 1873, 1874, and in 1876; and there is no pretense even of any accounting therefor to anyone. Besides all this, we find affirmative evidence in the record that the executrix retained at least three of the negroes who were never sold, but were emancipated after many years; and that she also had at her death personal property consisting of silver-ware and furniture that belonged to the elder Anderson, that was appraised as part of her estate at a valuation of $537.20.

For all of these reasons we are driven irresistibly to the conclusion that the dealings of this executrix with the personal effects and real estate of her testator were not *bona fide*, and that the sale of the real estate procured to be made by her was entirely unnecessary; and that its sale resulted from and grew out of the prior misapplication made by the executrix of the personal assets of the estate, if not for the express purpose of diverting the title to herself individually. There is

no proof that there was any prior understanding or
collusion between W. A. Forward and the executrix,
that he should for her use and benefit, purchase this
property at her sale thereof; and, in the absence of
convincing proof of such character that it could not be
explained by them were they now living, we must give
them the benefit of the conclusion that there was not
any such prior understanding between them, and, con-
sequently, that there was no fraud on Forward's part
in this transaction.  Still we think that the entire
management of the estate by the executrix that led up
to and finally culminated in the procurement of the
sale by her of the realty was a fraud in law, if not in
fact, upon the rights of these complainant remainder-
men, of which fraud she all along had full cognizance;
and whether W. A. Forward was an innocent pur-
chaser at said sale or not, the moment he re-conveyed
all of said property back to her, the original party
whose conscience stood bound by the violation of the
trust, it became re-invested with all of the equities and
trusts in her hands with which it was clothed before
its sale to the innocent purchaser, if such he was; and
subject, in her hands, to the same proceedings that
could before have been available to rescue it from
wrongful diversion, just as though there had been no
sale thereof by her.  This rule is thus stated by Mr.
Story in 1 Story's Equity Jurisprudence (11th ed.),
Sec. 410: "It is wholly immaterial of what nature
the equity is, whether it is a lien, or an encumbrance,
or a trust, or any other claim; for a *bona fide* purchase
of an estate, for a valuable consideration, purges away

the equity from the estate, in the hands of all persons who may derive title under it, with the exception of the original party whose conscience stands bound by the violation of his trust and meditated fraud. But, if the estate becomes re-vested in him, the original equity will re-attach to it in his hands." Kennedy vs. Daly, 1 Scholes & Lefroy, 355, 379; Vattier vs. Hinde, 7 Peters, 252; Troy City Bank vs. Wilcox, 24 Wis., 671; Johnson vs. Gibson, 116 Ill., 294; Allison vs. Hagan, 12 Nev., 38; Clark vs. McNeal, 114 N. Y., 287. We have before seen that the *onus* of proving knowledge and notice of illegal and fraudulent acts is upon the party who sets up the defense of *laches* in the institution of proceedings to avoid such fraud, and we have seen that no proof has been submitted by the defendant fixing notice and knowledge upon the complainants of these transactions, but it is contended by the appellant that they are chargeable with notice from the publication for the executrix's sale of these lands, and from the record of the deeds from the executrix to Forward, and from Forward back to her. The authorities seem to us to be adverse to this contention. Mrs. Anderson occupied the position of trustee towards this property at the time she sold it to Forward, and at the time Forward re-conveyed it to her, and, as she was never discharged, as we have seen, from her position of trustee, she occupied that relation to it at her death. In Oliver vs. Platt, 3 How., 411, it is said that the "time begins to run against a trust only from the time when it is *openly disavowed* by the trustee who insists upon

adverse right and interest, which is fully and unequiv-
ocally made known to the *cestui que trust*." This
doctrine is sustained also in Hearst vs. Pujol, 44 Cal.,
235, in and Janes vs. Throckmorton, 57 Cal., 368, and in
Knight vs. Haynie, 74 Ala., 542, and authorities *supra*.
At best all that could, under any circumstances, be
claimed for from the Probate Court proceedings, the
advertisement of the sale, and from the record of the
first of the last two mentioned deeds, would be that it
might in some cases be "constructive notice." This
will not do as between *cestui que trust* and trustee,
the knowledge to be shown must be *actual* before the
lapse of time can set the doctrine of laches in motion
in her favor. *In re* Marsden, L. R. 26 Ch. Div. 783.
While, as before seen, it was the right and privilege
of these complainants as heirs-at-law of the elder An-
derson to call for an accounting from Mrs. Anderson
in order to close up her administration of this estate
in her attitude towards it as executrix, still, it must be
remembered that even after so closing it up by a final
accounting, she, under the will, still had the right to
hold, use and control all of it as life tenant until her
decease. The remaindermen, knowing this fact, had
a right to rely upon her good faith and honesty, and,
under these circumstances, were not *obliged* to look
into her administration as executrix; but, knowing all
along that she was still living and still in possession of
properties left by their devisor, they were quite nat-
urally lulled by that possession into a feeling of repose
that all was well with their patrimony. In Pomfret
vs. Windsor, 2 Vesey, Sr., 472, Lord Hardwicke says,

in the case of a remainderman : "He has no reason to look into the natural determination of the estate." In Pepper vs. Ratz, 38 Mich., 96, the court says : "Where one has only constructive notice, laches is to be predicated of an *intentional* neglect to make inquiry rather than mere carelessness to do so." Duffit vs. Tuhan, 28 Kansas, 299; Life Association of Scotland vs. Siddal, 3 DeG., F. & J., 74; McMahon vs. McGraw, 26 Wis., 622; Bowden vs. Layland, L. R. 26 Ch. Div., 783. So long as Mrs. Anderson remained in possession of these lands, the devisees had the right to look upon her possession thereof as being either as executrix, or in the right of her life tenancy, and were under no obligation to look for any other title than the one under which she first took that possession. The deed from Forward to her did not even have the effect of being constructive notice to them, because it did not come in the line of their title, and they were in no position to anticipate or suspect the existence thereof. Billings vs. Stark, 15 Fla., 297: Lightner vs. Mooney, 10 Watts, 407; Keller vs. Nutz, 3 Serg. & R., 246; Maul vs. Rider, 59 Pa. St., 171; State *ex rel.* vs. Trustees I. I. Fund, 20 Fla., 406; Ely vs. Wilcox, 20 Wis., 557; McCarthy vs. McCarthy, 74 Ala., *supra*. We do not think that it has been shown that these complainants or their ancestry ever had any such knowledge or notice of the transactions involving the sale and conveyance of the realty of this estate as would visit upon them the charge of laches in moving to maintain their

rights therein, or that tends to estop them on the theory of acquiescence therein.

As to the property mortgaged by Peter Sken Smith to the executrix, and purchased by her at tax sale in her own individual name and right; inasmuch as she held this property as security for so large an indebtedness that she made no effort to collect or enforce out of the property, and for which there is no pretence even that she ever accounted; and that it seems from the allegations of the answer, was all that she could ever have reaped from the mortgage, viz: the mortgage land itself, we are of the opinion that, under all the circumstances, her tax title purchase thereof should enure to the benefit of the remaindermen, who would have been entitled to the fruits of the mortgage had she purchased it at a foreclosure sale thereof, instead of at the sale; and that her executor should account and render to the complainaints their proportionate share of all sums realized by his testatrix from the sales of any and all portions thereof that may have been sold and conveyed by her during her life time, with interest thereon, from the date of her death. Varney vs. Stevens, *supra*; Daviess vs. Myers, 13 B. Monroe, 511; Whitney, Admr., vs. Salter, 36 Minn., 103.

As to the Felicia H. Garvin lot, bought by Mrs. Anderson in March, 1844, at the sale to enforce the vendor's lien of the estate on same; we think that she should account for the price at which she sold and conveyed it, with interest from her decease.

It is further contended for the appellants that the Crafts and their trustee, De Saussure, who did not join as complainants, but were made parties defendant in this cause, are not entitled to any share in the relief to be granted, because they complained of nothing, and asked for nothing, and that the decree as to them is erroneous because thereof. There is nothing in this contention. The Crafts are entitled, in their proper proportion, to the same relief, and in virtue of the same right, as are the active complainants herein, and were necessary and proper parties to the suit, in order to a complete determination of all interests involved; and because they remain passive and are consequently made parties defendant, does not operate as a waiver or surrender of their rights in the premises. The defendant, Andrew Anderson, is himself entitled to a one-fourth share in all the properties involved in this litigation, under the will of the elder Andrew Anderson, as a devisee under said will; because he does not claim it herein, in the same right as do the other reversioners, but on the contrary, is a defendant actively opposing and denying their claims, furnishes no reason why he should be deprived of his interests acquired through the same source as the others.

Our judgment is that the complainants and the defendants Crafts are entitled to a decree for their respective shares and interests according to the provisions of the will of Andrew Anderson, Sr., in and to all of the real estate included in the deed from William A. Forward to Clarissa C. Anderson that was

found in her possession and the title to which was standing in her name at the time of her decease ; and in and to all of the lands motgaged to her by Peter Sken Smith, as executrix, and which she bought at tax sale, the title to which remained in her at her decease ; and that the defendant, Andrew Anderson, as her executor, should account to them for their pro portionate parts of the rents, incomes and profits of all of such real estate as remained in her name from the date of her decease, with the legal accumulation of interest thereon since that date ; and that it should be referred to a master to ascertain and report what portions of said real estate that was conveyed to her by William A. Forward, and by said tax deed of the Peter Sken Smith lands, have been sold and conveyed by her to other parties and the prices at which she sold the same ; as well also as the price at which she sold and conveyed the lot known as the Felicia M. Garvin lot that she bought at the U. S. Marshal's sale under the decree to enforce her testator's vendor's lien thereon, with interest thereon from the date of her decease ; and that the defendant, Andrew Anderson, as her executor, should account to the complainants and the defendants Crafts for their respective shares and proportionate parts thereof according to the provisions of the will of Andrew Anderson, Sr. And that the complainants and defendants Crafts are also entitled to their respective proportions, according to said will of Andrew Anderson, Sr., in and to all of the personal effects of the said Andrew Anderson, Sr., deceased, that were found *in kind* in the hands of the

said Clarissa C. Anderson at her decease. And the decree of the court below appealed from is hereby ordered to be modified so as to comply herewith.

An application for a rehearing in this cause has been made, and is denied, because it presents no matter of either law or fact that has not received that careful consideration by the court that the importance of the issues involved demanded.