This is a petitory action. The title to the property involved in the suit was vested in Mary Ann Herndon at the time of her death.
The plaintiffs allege that Mary Ann Herndon died intestate in 1905; that she was not survived by ascendants or lawful descendants; that in 1917 the defendant, David H. Raines, pretending to be the legitimate child and sole heir of the deceased, had himself recognized as such, and sent into possession of her estate; that since said time he has enjoyed the possession and use thereof; that he has executed mineral leases thereon, and has collected from the lessees bonuses, rents, and royalties approximating $100,000; that plaintiffs are collateral heirs of the deceased, and, as such, they have been recognized and sent into possession of a one-eighteenth interest in her estate. The plaintiffs pray for a judgment annulling the judgment recognizing David H. Raines as the legal heir of Mary Ann Herndon, deceased, and sending him, as such, into possession of her estate; and for judgment recognizing plaintiffs as collateral heirs of the deceased and the owners of a one-eighteenth interest in her estate, and requiring the defendant to render an accounting, and to pay to plaintiffs one-eighteenth of all bonuses, rents, and royalties he has received from the leases of the property of said estate.
The defendant, in his answer, alleges that the succession of Mary Ann Herndon was opened and closed in 1917; that defendant was recognized as her sole heir, and sent into possession of her estate, and thereafter the probate court had no jurisdiction over *Page 628 
the property, the ownership and possession of which it had decreed to be in him; that defendant is the legitimate son and sole heir of Mary Ann Herndon, deceased; that the judgment so recognizing and sending him into possession of her estate is valid, and was obtained on legal evidence. He denies all allegations of the petition affecting his legitimacy, and, as plaintiff in reconvention, he alleges that the judgment of the probate court recognizing the plaintiffs as collateral heirs of Mary Ann Herndon, deceased, was improvidently and illegally granted, and is a cloud on the title to the property he inherited from his deceased mother, and the said judgment should be annulled and erased from the records. The prayer is for a judgment rejecting the demands of the plaintiffs and for judgment in reconvention avoiding the judgment recognizing the plaintiffs as heirs of Mary Ann Herndon, deceased, and ordering its erasure from the records.
Several incidental issues are presented by the pleadings, but, from our view of the case, it is not necessary to state them. The judgment appealed from rejects the demands of the plaintiffs, but is silent as to defendant's reconventional demand. Defendant has answered the appeal, and prays for the amendment of the judgment in that respect.
Plaintiffs attack the legitimacy of the defendant upon the theory that John Raines, the father of defendant, was a white man, and Mary Ann Herndon, his mother, was a free woman of color, and, as marriage between the races was prohibited at the time of his conception, and as no acknowledgment of him, in the manner required by law, was made by either of his parents during the period when racial intermarriages were not prohibited, the defendant is incapable of inheriting from either of his parents.
It is admitted that Mary Ann Herndon was a free woman of color. The record discloses that John Raines obtained a license, *Page 629 
in the usual manner, and perfect on its face, to marry Mary Ann Herndon; that the marriage ceremony was performed by a qualified justice of the peace in the presence of white and colored persons. The presumption is that the marriage was legal, and that the clerk who issued the license and the justice of the peace who performed the ceremony knew the law and did their duty. It follows, therefore, that, before plaintiffs can recover, they must prove that John Raines was a white man, and the proof of that fact must be established with sufficient certainty to overcome the testimony to the contrary which appears in the record, and also to overcome the presumed legality of the marriage and the consequent legitimacy of defendant. In all Christian countries, where filiation is established, the law presumes that the issue thereof is prima facie the offspring of a lawful, rather than of a meretricious, union of parents. Orthwein v. Thomas, 127 Ill. 554, 21 N.E. 430, 4 L.R.A. 434, 11 Am. St. Rep. 159. The presumption indulged in favor of legitimacy cannot be overcome by mere rumor. Vaughan v. Rhodes, 2 McCord (S.C.) 227, 13 Am. Dec. 713. In the absence of persuasive evidence, the denial of marriage cannot defeat the presumption of the legitimacy of the issue, or throw upon such issue the burden of proof of the marriage of the parents, and the presumption in favor of marriage and the legitimacy of the offspring is strengthened by the lapse of time. In re Pickens' Estate, 163 Pa. 14, 29 A. 875, 25 L.R.A. 477.
The plaintiffs offered six witnesses to prove that John Raines was a white man, viz. R.H. Harrell, Robert Tyson, Charley Hamlin, Calvin Hamlin, Sam Sewell, and J.M. Teat. The witness Teat was born many years after the death of John Raines. He has no personal knowledge of any fact of the case. He says that during the month of June, 1911, he casually met David Raines at a spring *Page 630 
about two miles from the latter's house, and that David told him that his (David Raines') father was a white man. On cross-examination this witness admitted that he had a contract with the plaintiffs for an interest in the outcome of the suit, and that he had employed the firm of Bullock Warren, the plaintiffs' counsel, in this case. The witness Sam Sewell says that he once heard John Herndon say that John Raines was a white man, but that Herndon was not talking to him when he made that statement, but to his family, and that he made this statement about a year before he died. On cross-examination the witness was asked to name the members of Herndon's family who were present at the time the statement was made. In reply the witness said that all members of the Herndon family who were present at that time were now dead, and that the three living daughters who were in the courtroom were not present when the statement was made. The witness Charlie Hamlin testified that David Raines told him John Raines was a white man, and that he had heard other members of the family say the same thing. Witness Robert Tyson testified to the same effect. The testimony of the foregoing named witnesses was admitted in evidence, over the objection of counsel for the defendant, to prove reputation in the community.
R.H. Harrell and Calvin Hamlin are the only witnesses for the plaintiffs who ever saw John Raines. Harrell testified that he is 75 years old. He says it was generally understood that John Raines was a white man. Witness was not well acquainted with Raines, but saw him occasionally. Witness was 10 years old when John Raines and Mary Ann Herndon were married. He did not attend the wedding, but the white landowners of the vicinity did, and there was no indignation over it. The witness Calvin Hamlin testified that he was born in 1854. When he was about 6 years old he saw John Raines *Page 631 
in a skiff with white people coming down the bayou. This is the only time that witness ever saw John Raines, but, after the lapse of about 65 years, the witness testifies that he remembers the skiff incident, and remembers that John Raines had blue eyes, straight hair; that he talked like a white man; and that he had a gruff voice.
Joseph Herndon, Jim Herndon, and Martha Payne, two of the brothers and a sister of Mary Ann Raines, deceased, testified for the defendant. They knew John Raines well. Joseph Herndon, at the time he testified in the case, was 83 years old, and Jim Herndon and Martha Payne were over 70 years old. They testify that John Raines' complexion was dark; that his hair was very curly; that he associated entirely with negroes; and that they believed he had negro blood. Joseph Herndon testified that John Raines came to the community in which witness lived about 1853. He just drifted in, but witness never knew where he came from. We quote the following from the testimony of Joseph Herndon as being, in substance, typical of the testimony of the three defense witnesses:
 "Q. Was there any other child older than you of your father and mother?
 "A. Yes, two.
 "Q. Two?
 "A. Yes, sir.
 "Q. Who were they?
 "A. Dave Herndon and Mary Herndon.
 "Q. Mary Ann Herndon?
 "A. Yes, sir.
 "Q. She was older than you?
 "A. Yes, sir; older than me.
 "Q. Who else?
 "A. Sarah Herndon; she's dead.
"Q. I see. You lived on that place until a few years ago when you moved to Texarkana?
 "A. Yes, sir.
 "Q. Joe, did you know John Raines?
 "A. Yes, sir.
 "Q. When did he come to that community?
 "A. Well, I don't know, sir.
 "Q. About when?
 "A. Along about 1853 — somewhere along there.
 "Q. It was up in the 50's?
 "A. Yes, sir; somewhere along in there. *Page 632 
"Q. Well, whom did John go with there in that community — white people or colored people?
 "A. He went with colored people — a whole lot.
 "Q. Colored people?
 "A. Yes, sir.
 "Q. Did he wait on your sister?
 "A. Yes, sir.
 "Q. Was she colored or white — considered to be?
 "A. Colored.
 "Q. She was considered to be colored, was she?
 "A. Yes, sir.
 "Q. She did have some white blood in her?
 "A. Oh, yes.
"Q. Now, John, you say, went to see her as his sweetheart?
 "A. John?
"Q. John Raines. He came to see her there as his sweetheart?
 "A. No, sir; he married her.
"Q. Well, how long did he know her before he married her?
"A. Well, I don't know; I think it was some 2 or 3 years — maybe longer.
 "Q. Some 2 or 3 years?
 "A. Yes, sir.
 "Q. Do you know where Raines came from?
 "A. No, sir; I don't know.
 "Q. What kind of a looking fellow was he?
 "A. Oh, well —
 "Q. Was he dark complected?
 "A. He was dark — yes — curly hair.
 "Q. What kind of hair?
 "A. Curly hair.
 "Q. Very curly?
 "A. Very curly.
 "Q. Now, did you hear where he came from?
 "A. John Raines?
 "Q. Yes.
 "A. No, sir.
 "Q. He just drifted into that community?
 "A. Yes, sir.
 "Q. What was he doing there?
"A. Well, he was generally following rafting on the bayous and lakes.
 "Q. Worked there on the lakes?
 "A. Yes, sir.
"Q. Now, when he married your sister did he go into the house and live with her?
 "A. Yes, sir.
 "Q. Just as man and wife?
 "A. Yes, sir.
"Q. Was there anything considered wrong in their marrying there?
 "A. No, sir.
"Q. Now, Joe, some have testified here that John Raines was known everywhere there as a *Page 633 
white man. Did you ever hear anybody say that he was a white man?
 "A. I never heard it discussed at all.
 "Q. How is that?
 "A. I never heard it discussed at all.
"Q. Never was discussed as to whether he was white or black?
 "A. No, sir.
"Q. I will ask you to state what you considered him to be — white or black?
"A. I considered him to have a little colored blood in him.
 "Q. Colored blood?
"A. He associated with colored folks; and I imagine he must have had some colored blood.
 "Q. You base your opinion on his looks and actions?
 "A. Actions.
 "Q. He lived with your sister there how long?
 "A. Well, I don't know.
"Q. Well, about how long — was it a year or two years?
 "A. About a year and a half or two years.
 "Q. What became of him?
 "A. He went to war.
 "Q. Went to war?
 "A. Yes, sir.
 "Q. He never returned?
 "A. No, sir.
 "Q. Joe, did you go to war?
 "A. Yes, sir.
 "Q. Did your brothers go?
 "A. One of them did, yes, sir.
"Q. Which side did you go on — the South or the North?
 "A. South.
 "Q. You fought on the side of the Confederacy"
 "A. Yes, sir.
"Q. Joe, now, when your sister, Mary Ann, married John Raines, were you there?
 "A. Yes, sir.
"Q. A number of people attended the wedding, did they not?
 "A. Yes, sir.
 "Q. Did they have a license?
 "A. Yes, sir.
 "Q. Who performed the ceremony?
 "A. I think old man Dick Evans.
 "Q. Dick Evans?
 "A. Yes, sir.
 "Q. Well, did they give a supper afterward?
 "A. Yes, sir.
 "Q. Good many people there?
 "A. Right smart; yes, sir.
"Q. Then did John and Mary Ann live there in the house together as man and wife until he went off to war?
 "A. Yes, sir. *Page 634 
"Q. Now, when was Dave Raines born? Was he born before John Raines went to war?
 "A. I think he was.
 "Q. You think that he was?
 "A. Very young, though.
 "Q. He was very young?
 "A. Yes, sir.
"Q. He was very young when his father went to war — not large enough to recollect him?
 "A. No, sir — no, sir.
"Q. Did you see Dave Raines when he was quite a little fellow?
 "A. Dave Raines?
 "Q. Yes; after he was born?
 "A. Oh, yes.
"Q. There was no question but what he was the son of Mary Ann?
 "A. No, sir.
 "Q. Was he always considered as her son?
 "A. Yes, sir.
 "Q. Reared in her house?
 "A. Yes, sir.
 "Q. Fed and clothed by her?
 "A. Yes, sir.
"Q. Did she always acknowledge him as her child everywhere?
 "A. Yes, sir.
 "Q. On up to the time of her death?
 "A. Yes, sir.
 "Q. When did that occur?
 "A. Her death?
 "Q. Yes.
 "A. I don't recollect what year.
"Q. About when — twenty years ago — something like that?
 "A. I think it has been that long.
"Q. Did your sister have the license and keep them there — Mary Ann, did she have the license?
 "A. Yes, sir; I think so.
"Q. Did she always consider that she was married to John Raines?
 "A. Yes, sir.
"Q. Did she always refer to him afterwards as her husband?
 "A. Yes, sir.
 "Q. On up until the time of her death?
 "A. Yes, sir.
 "Q. Did she ever marry again?
 "A. No, sir."
The defendant testified that he had no recollection of his father; he does not know whether he was white or black; and he therefore denied that he ever told any one that his father was a white man. *Page 635 
Aside from the fact that Joseph and Jim Herndon and Martha Payne might have profited financially had they suppressed the facts within their knowledge, we think their testimony, otherwise, bears the stamp of truth. On the other hand, the testimony offered by the plaintiffs is of a self-serving character, given by witnesses who have an interest in the result of the suit. Any further review of the testimony seems to be unnecessary. Plaintiffs have failed, even by a preponderance of evidence, to establish the one fact which it is essential they must establish before they are entitled to recover, viz. that John Raines was a white man, and therefore the lower court properly rejected plaintiffs' demands at their cost.
Defendant reconvened in the suit, and prayed for judgment on his reconventional demand, and the judgment below should have disposed of that issue. We think the judgment recognizing the plaintiffs as collateral heirs of Mary Ann Raines, deceased, and sending them into possession of a one-eighteenth interest in her succession, was improvidently rendered, and is a cloud upon defendant's title to the property inherited by him from his deceased mother, and, for the two reasons stated, it should be avoided and erased from the records of Caddo parish. It is therefore ordered that the judgment appealed from be, and it is hereby, amended, and it is now decreed that there be judgment in favor of the defendant, in reconvention, and against the plaintiffs, avoiding the judgment rendered in suit No. 35188, entitled Succession of Mary Ann Herndon, of the docket of the First judicial district court for the parish of Caddo, on November 19, 1917, and ordering its erasure from the records of Caddo parish, and, as thus amended, that said judgment be affirmed.
LAND, J., recused. *Page 636